EDWARD F. SWINNEY and E. H. WRIGHT v. CONTINENTAL BUILDING COMPANY, a Corporation, Appellant.—102 S. W. (2d) 111.

Court en Banc, February 12, 1937.

*Cooper, Neel, Kemp & Sutherland* for appellant.

*Ryland, Stinson, Mag & Thompson, Alfred M. Seddon* and *Frank O. Knight* for respondents.

614

HYDE, C.—This is an action in seventy-nine counts to enforce a contract for the payment of certain bonds. Each count covered bonds of separate original ownership ranging in amounts from $100 to $5,000. Suit was brought by plaintiffs for their own bonds and as assignees of the bonds of seventy-seven others. The trial was before the court without a jury, which found for the plaintiffs. Judgment was entered for the total sum of $52,259.31 and defendant has appealed therefrom.

Plaintiffs claim that defendant is liable to pay the principal of the bonds sued for because of the following proposal, made by the organizers of the defendant corporation, to-wit:

"Proposal: To the Individual Members of the Kansas City Athletic Club and any other eligible persons who are desirous of having completed the steel frame structure designed for an Athletic Club Building, located at the Northwest Corner of Eleventh Street and Baltimore Avenue, Kansas City, Missouri, and desire to become members of the proposed Athletic Club hereinafter mentioned: Fred H. Fitch and Albert R. Jones, of Kansas City, Missouri (for themselves, or their corporate successor as owner of such building premises), hereinafter referred to as the Owners, make you the following proposal:

"(1) It is estimated that $2,200,000 will be required to complete, furnish and equip said structure as an athletic club building, and the owners have procured a loan of $1,600,000 therefor, leaving a balance of $600,000. The owners will themselves expend the amount required

of such balance, provided 3,000 eligible persons shall, prior to July 1, 1922, be enrolled as resident members in the manner and each making the payments and accepted application hereinafter provided. Such payments, including the initiation fee, shall be used only to reimburse the owners for expenditures or liabilities so made or incurred. Except for possible additional stories and the omission of the bowling alley and grille on the Baltimore Avenue floor, the building will in such event be completed, finished and equipped by the owners with all reasonable expedition, substantially as originally planned by the Kansas City Athletic Club, and will be devoted to the purposes of the new Club and the use and enjoyment of its members. But the owners will use for other purposes the first or Baltimore Avenue floor and third floors and portions of the basement and second floors, and reserve the right so to use such other space in the building as will not interfere with the normal operation of the Club.

"(2) The full payment required of the first 3000 resident members before opening of the Club shall be $200 each, of which $10 shall be the initiation fee, and it, with the remaining $190, shall be employed to reimburse the owners for money expended or liabilities incurred in completing, furnishing and equipping the building. Such payment shall be made as follows: At least $25 with application and the remainder in installments thereafter of $25 each, payable on the first day of every calendar month, beginning August 1, 1922, until the entire amount is paid. The annual dues of such members shall be limited to $80 per year, payable quarterly in advance beginning on the day when the Club is formally opened. Resident members shall not be liable for any assessments whatever, but shall be obligated, after opening of the Club in the new building and during the continuance of their membership therein, for their dues and house accounts, together with revenue taxes thereon levied by any governmental authority. Persons residing in Greater Kansas City and the suburbs thereof shall be admitted to membership only as resident members.

"(3) The foregoing payments for which members shall be obligated before opening of the Club, shall be deposited with Edward F. Swinney, of Kansas City, Missouri, as Trustee, who shall issue receipts therefor and hold, use and disburse same in accordance with the provisions of the membership application form hereinafter set forth. Such receipts shall be promptly delivered to applicants for membership or members, upon the making of their respective payments.

"(4) The Kansas City Athletic Club, in its efforts to promote said club building, heretofore issued approximately $153,000 in second mortgage bonds which were sold largely to its members. To insure the earnest cooperation of the holders of these bonds, the owners agree that, if the requirements of this proposal as to total membership shall be complied with and the building is completed and used for a Club as herein contemplated, they will pay off the principal of such bonds,

the present registered owners of which shall have become members of the new Club on or before July 1, 1922, without interest, in semi-annual installments, at the rate of 10% per year, distributed pro rata, beginning when the Club shall have been in operation in such building for two years.

(Paragraphs 5 to 8 inclusive are not material to this controversy.)

"(9) Each resident member of such Club shall sign an application in the following form:

"Kansas City, Mo., June, 1922.

"I hereby apply for resident membership in the Athletic Club to be located at the northwest corner of Eleventh Street and Baltimore Avenue, Kansas City, Missouri, upon the following conditions:

"(1) Fred H. Fitch and Albert R. Jones, or their corporate successors, upon the making on or before July 1, 1922, of 3000 applications of similar form for resident membership by persons residing in Greater Kansas City and the suburbs thereof, and the acceptance of such applications by them, shall proceed to complete and equip the steel frame structure at above location, substantially as originally planned by the present Kansas City Athletic Club, and shall organize, manage and maintain an Athletic Club therein.

"(2) All payments made by applicants for membership in such Athletic Club, including my payments, shall be deposited with Edward F. Swinney (President of First National Bank in Kansas City, Missouri), as Trustee, which with any accrued interest thereon shall be paid to the order of Fitch and Jones, or their corporate successor, upon the formal opening of the Club in such building on or before September 1, 1923, and otherwise shall be returned with any interest to said applicants, including myself.

"(3) I shall not be liable for any assessments whatever. My membership dues, payable only after opening of the Club, shall be limited to $80.00 per year.

"(4) This application is in consideration of the agreement of said Fitch and Jones so to complete, equip, open and maintain the building as a club and, if elected, I agree to abide by all rules and regulations affecting members.

"(5) I agree to pay to said Trustee $200.00, as follows: $25.00 with this application; $25.00 on the first day of each calendar month thereafter, beginning August 1, 1922, until the entire amount is paid, ($10.00 of which is for initiation fee and it, with the remaining $190.00, shall be in reimbursement of money expended in completion and equipment of the building.)

"Proposed and endorsed by

"Signature

"Business

"Business Address

"Accepted 1922.

"Executed at Kansas City, Missouri, this June 7th, 1922.

"(Signed) Fred H. Fitch,

"Albert R. Jones."

The events which led up to the making of this proposal were that the members of the Kansas City Athletic Club decided in 1917 to build a new building. Pursuant to their plans, they obtained a 200-year lease upon lots located at the corner of Baltimore Avenue and Eleventh Street. Because the World War held up all such building operations, they were unable to proceed further until 1919, when the lease was assigned to the Athletic Building Association. This corporation in an attempt to finance the building, issued second mortgage bonds, which were made obligations also of the Kansas City Athletic Club and were sold to its members. While it was contemplated that $700,000 of these bonds would be issued only about $153,000 were actually sold. They failed to obtain first mortgage financing and the club, which had begun to build without knowing where all of the required money would come from, found itself unable to proceed and had to show for its efforts only the foundation and steel frame for a nineteen-story building. The steel for this frame had been purchased from the Kansas City Structural Steel Company, which had a mechanic's lien therefor against the property upon which it obtained judgment for $259,765,98. The property was sold under this judgment, wiping out the lien of the second mortgage bonds thereon, to Mr. Fred H. Fitch, one of the officers of the steel company. He also purchased the fee simple title from the club's lessor. Mr. Fitch thereafter sold one-half interest in the property to Mr. Albert R. Jones. Fitch and Jones planned to build an office building and employed architects to work out the necessary changes in the steel frame and also arranged with Straus & Company of Chicago for a $2,000,000 first mortgage to finance the construction of such an office building.

Early in 1922, before Fitch had sold a half interest in the property to Jones, he had written a letter to the Athletic Club officers, stating certain conditions, upon which he would complete the building as an Athletic Club as they had originally planned. After Mr. Jones became a half owner of the property and it was announced that the owners had decided to build an office building, members of the Athletic Club sought to interest both of them in completing the building as an athletic club and assured them that, if this would be done, they could obtain a membership of 3000. Fitch and Jones took the matter up with Straus & Company and finally got their agreement to make a first mortgage loan of $1,600,000 if 3000 members could be obtained for such a club. As a result of these negotiations, the above proposal was executed by Fitch and Jones and delivered to the club officials, and a campaign to obtain 3000 applications for membership in a new club by July 1, 1922, was commenced at once.

At the suggestion of the old club's officials, Mr. Sam B. Sebree was selected as general chairman of this campaign. He was paid $1000 a week for the four weeks of the campaign. The arrangement concerning this was that the officers of the old athletic club raised $4000 among their members to pay Mr. Sebree, with the understanding that if the campaign was successful, Fitch and Jones would pay him and the money put up by the members for this purpose would be returned to them. Mr. Sebree's compensation was finally paid by Fitch and Jones. Mr. Sebree organized about 200 members of the old club, who volunteered as workers, into teams which sought out prospects from the list he prepared and solicited them to sign membership applications. Letters describing the proposition were also sent to these prospects. Some of them were signed by Mr. Sebree and others by Mr. Walker, president of the old club. These applications were passed upon, as to desirability of the applicant as a member of the new club, by committees appointed by Mr. Sebree from among the old club members. There were 2044 applications received in this campaign which were acceptable to the members of the old club and which were turned over to the defendant as the corporate successor of Fitch and Jones.

The evidence showed that the proposal was first written without the provisions contained in Paragraph 4. However, members of the old club said that some of their members felt that they had already put their money into the building, by purchasing the second mortgage bonds, and insisted that they should be taken care of, both because of the obligation which the old club owed them and because, since they were prominent both in club and business circles, their cooperation and influence would be required to obtain enough new members necessary to make the new club a success. The following letter was sent during the campaign to the holders of these bonds by Mr. Sebree. Whether or not it had the approval and consent of Fitch and Jones is a disputed matter.

"Several years ago your interest in Kansas City and the Kansas City Athletic Club prompted you to buy Second Mortgage Bonds on the building at 11th and Baltimore. The Club was unable to finance that building and a Receiver was appointed. In the Receivership, the building was sold and your bonds became of no value.

"The present owners of the steel frame, Mr. Fred H. Fitch and Mr. Albert R. Jones, lately made a proposition to the Club directors to build, finance, equip and maintain it as a Club; the obligation of the Club being to raise 3000 members by July 1, 1922. The Directors of the Club, before undertaking this campaign for members, insisted that if it were successful, that all the holders of these Second Mortgage Bonds be protected. Mr. Fitch and Mr. Jones readily agreed to this and included in their proposition an agreement that the present registered holders of these bonds who join the Club by July 1, 1922,

will be refunded their investment in full if this campaign is successful.

"The Directors are very anxious that this campaign go over, not only because it will insure for Kansas City one of the finest Athletic Clubs in the United States, but also because the Club will thereby be able to repay its obligation to you, who stood by it with your funds.

"The initiation fee of $200.00 in the new Club, is very nominal for such a Club. Those joining are guaranteed a Club or their money back. Mr. E. F. Swinney, President of the First National Bank, has agreed to hold all initiation fees in trust until the Club is formally opened and, if it is not so opened by September 1, 1923, to return them.

"The Directors in asking you to join the Club and get behind them in this membership campaign, are not asking you to take any chance, but are asking you to take advantage of the opportunity they have given you to join with them in bringing about this great civic improvement and at the same time get your money back.

"I trust that we can count on you for your whole-hearted support.
"Yours very truly,
"(Signed) Sam B. Sebree, Chairman."

Mr. Walker also wrote a letter, which was used in the campaign, as follows:

"Our Dream Come True.

"Dear Sir:

"Mr. Albert R. Jones and Mr. Fred H. Fitch, two foremost Kansas Citians, whose financial responsibility is beyond question, largely through civic pride, have agreed to finance, build, equip and maintain the building at 11th and Baltimore as an Athletic Club.

"There is no financial responsibility assumed by you or the Club in this undertaking.

"Our only responsibility is to raise 3000 resident members which must be secured by July 1st, 1922 (otherwise the building must be finished as an office building), which means that you and every one of your friends must join the Club at once.

"You know that the location is the finest for this purpose in the city. The club will be twenty-one stories high and will include all features and equipments that can be found in the finest clubs in the world. The club will have all the conveniences for you, *your wife* and your children which were included in the original plans, *and more.*

"The present registered owners of the second mortgage bonds who join the club by July 1st, 1922, will be refunded their investment in full if this plan goes through.

"You can have this wonderful club for the nominal membership fee of $200. In order to make this club within the reach of every worthy young man, arrangements can be made to pay this fee in installments.

"Your initiation fee will be deposited with E. F. Swinney, President of the First National Bank, Trustee, who will return it to you if the building is not formally opened as a club, by September 1st, 1923. IN OTHER WORDS, YOU ARE GUARANTEED A CLUB OR YOUR MONEY BACK.

"The initiation fee is the same to everybody.

"*This membership is non-assessable.* The dues do not start until the building is finished and occupied as a club, and can never be increased.

"It is up to you. The time is short! Sign and return to Sam B. Sebree at 1016 Central one of the enclosed blanks, together with check to E. F. Swinney for at least $25. Get some friend of yours to do the same with the other one and you will have done for yourself, your friend and your city a thing for which you will always be justly proud.

"Yours for Kansas City,
"(Signed) C. H. Walker, President."

Toward the last days of June it became apparent to all that 3000 applications for membership would not be obtained by July 1. In order to prevent a failure of the enterprise and to have the building finished as an athletic club, the following guaranty was executed and accepted by Fitch and Jones:

"K. C. A. C.
The Agreement of July 1, 1922.
Relative to an
ATHLETIC CLUB
Between
Fred H. Fitch and Albert R. Jones,
as Owners
C. C. Peters and Thirty Others,
as Guarantors
K. C. A. C.
"The Agreement of July 1, 1922, Relative
to an Athletic Club.

"This Agreement made this July 1, 1922, between Fred H. Fitch and Albert R. Jones, of the one part, hereinafter called the Owners, and the Subscribers hereto and each of them who sign this agreement under the caption of Guarantors and are hereinafter called the Guarantors, of the other part, Witnesseth, that the said parties have agreed as follows:

"1. The Owners signed and delivered on June 7, 1922, a writing designated Proposal to Individual Members of the Kansas City Athletic Club and Other Eligible Persons, etc., a copy of which is hereto attached and by reference its contents are made a part hereof.

"2. Pursuant to that Proposal certain printed applications for resident memberships in the Athletic Club herein referred to have, conformable to and induced by the said Proposal, been signed and

delivered by some 2000 persons and such applications have heretofore been approved and accepted by the Owners, and it is the desire of the parties hereto that the terms of the said Proposal shall be complied with and that the said enterprise be developed and carried into effect in accordance with the terms of the said Proposal and that the said applicants shall have the use and enjoyment of the Athletic Club referred to in the Proposal in accordance with the intent and purpose therein expressed, and so it is agreed between the parties hereto in consideration of the mutual benefits to be derived from this agreement that:

"3. The Owners shall proceed forthwith to complete, furnish and equip the said structure referred to and described in the said proposal as an Athletic Club Building in substantial accordance with the said Proposal, and at an estimated cost of substantially $2,200,000; and that they will proceed forthwith to organize and manage an athletic club as a fraternal organization under the laws of Missouri, and each of the applicants hereinbefore referred to and such other persons as are acceptable shall or may be and become members thereof on the express understanding that all the rules, regulations, by-laws and conditions of the said Club shall be acceptable to and shall be enforced by the Owners, and such rules, regulations, by-laws and conditions shall be in substantial accord with the said Proposal.

"4. And it is the intent and purpose of the parties hereto that the membership of the said Club shall reach the number of 3000 on or before the opening of the Club which shall not be later than September 1, 1923; and to that end the Guarantors promise that three-fourths of the number of applications required to bring the present number of applications, which is not less than 2000, up to 3000 shall be forthcoming and submitted to the Owners on or before the opening of the Club for their approval and acceptance, and the form of such application shall be substantially the same as that recited in the said Proposal with the exception of the time or times of the payment of the amount specified in Paragraph 5 of the said Proposal on or before the opening of the Club and that if there is a shortage of such acceptable applications at that time they will then pay to the Owners the sum of $200 for each of the applications required to make up that shortage; and as between themselves, that is, as between the Guarantors themselves, this liability shall be pro-rated between them in accordance with the number of Guarantors, but as between the Guarantors and the Owners the individual liability of each Guarantor shall be limited to $5,000.00.

"5. It is further agreed in case such payment is made by the Guarantors the members admitted to the Club after such payment shall be required to pay for admission the sum of $200 apiece and that the sums so paid by them shall be applied monthly to reimburse the Guarantors pro-rata for the amounts advanced by them respectively

on this guaranty; and after such amounts have been refunded in full to the Guarantors, and until the membership shall have reached 3000 on which each member shall have paid for admittance the sum of $200, the Owners shall be entitled to and shall have such admission fees and payments until they have received from that source the full sum of $600,000 contemplated by the said Proposal; and thereafter the amount of the admission fee, the terms of payment and the application thereof shall be dealt with and regulated in the rules and by-laws governing the Club.

"6. Upon the completion of the said Athletic Club Building the Owners promise and agree with the Guarantors and for the use and benefit of the Athletic Club, to be formed as hereinbefore provided for, to open, maintain and operate such structure and premises as and for the uses and purposes of an athletic club and in substantial compliance with the terms of the said Proposal for a period of at least ten years from the opening thereof.

"7. It is agreed and understood that the Owners have the privilege and right to form a corporation under the laws of Missouri with power to hold and develop the said real property, being all of the property on which the said steel structure is now located, for the purpose herein stated, and convey the same to such corporation in fee, and upon the assumption by such corporation concurrently with such conveyance of the terms and conditions of this agreement binding and obligatory upon the Owners and personal liability of the Owners on this agreement shall cease and come to an end.

"Witness our hands the date aforesaid.

"Executed in Duplicate." (This instrument is signed by Fitch and Jones, as Owners, and by thirty others as Guarantors.)

Thereafter, the incorporation of the defendant Continental Building Company was completed, the property was conveyed to it, and a further agreement was made, dated July 3, 1922, providing that, pursuant to the provisions of both the proposal and the guaranty, Fitch and Jones were released from personal liability, and that the defendant as their corporate successor, assumed all liability which they had undertaken. In August, 1922, the new athletic club, which had been organized, was incorporated. Portions of Sections 2 and 4 of Article 1 of the by-laws then adopted were as follows:

"Section 2. All persons who at the time of the opening, for actual operation and use, of the new Club building at the Northwest Corner of 11th Street and Baltimore Avenue in Kansas City, Missouri, shall have applied and been accepted for membership in the Club in accordance with the provisions and conditions of the written proposal dated June 7, 1922, made by Fred H. Fitch and Albert R. Jones to prospective members, *and shall each have paid the full sum of* $200, *pledged by their respective application agreements, shall then become*

and have all the privileges of, *resident members* as herein provided and subject to these by-laws.

"Section 4. The property used by the Club, including the land, building, furnishings and all equipment and accessories, are owned and shall be operated by Continental Building Company, a Missouri corporation, or its successors in interest, hereinafter called the 'Owner.' The Owner shall have charge of the organization, management and conduct of the Club. All expenses of operating the club building shall be borne by the Owner and the Owner shall receive all revenues of the Club or derived from the club building, its equipment and facilities. . . . All such revenues, income, receipts, fees, dues, accounts and contributions *shall be payable directly to the Owner, and the club shall have no interest in same.* The members shall not be subject to assessment.''

These by-laws were in effect when, in June, 1923, another four weeks membership campaign was conducted. This was also managed by Mr. Sebree, who was again paid $4000 by defendant therefor, and 1100 applications were secured and delivered to defendant. This made a total of 3144 applications secured between June 7, 1922, and September 1, 1923, but 225 of these applicants never made even the first payment. Of the first 2044 applicants, whose applications were secured prior to July 1, 1922, only 1642 paid their $200 membership fee. Of the total 3144 applications secured prior to September 1, 1923, the number of applicants who paid their $200 membership fee was 2497. Less than 2600 resident membership certificates had been issued by the club prior to the trial of this case in 1928. The club building was finished and opened on September 1, 1923, and thereafter continued as such. On September 1, 1923, defendant received the money which had up to that time been paid on memberships to Mr. Swinney, which amounted to $323,232.50. Further payments for memberships were made direct to defendant.

While all payments on memberships made by applicants prior to September 1, 1923, were deposited with Mr. Swinney, their applications were held by Mr. Hermelink, who had been the chief assistant to Mr. Sebree in the first membership drive and who became the secretary of the new athletic club as soon as it was organized. The defendant paid him therefor $5000 per year beginning with July 1, 1922. Hermelink had been an enthusiastic member of the old athletic club and was very active in the membership campaign. As secretary of the new club he sent out the bills monthly to the applicants for the installments due on their memberships. He did this from ledger cards which "were made up from accepted applications and were kept as a part of the permanent records of the Continental Building Company and the new Athletic Club.'' The defendant and the new Athletic Club had the same office. Membership certificates were not issued to an applicant until he had paid the $200 membership fee in

full. However, when the club was opened privilege cards granting privileges of the club were issued to all applicants who had paid $100 on their membership. When the second membership drive closed, after obtaining 1100 applications, there was a banquet in celebration of its success and a copy of the guaranty was burned. Mr. Jones was present and made a speech on this occasion. After the second membership campaign a few of the bondholders inquired about the payment of their bonds. Three or four of them wrote letters to which Hermelink replied. The following letter is typical of his answers:

"Dear Sir:

"In answer to your favor of the 27th inst. in regard to Second Mortgage Bonds held by Mr. Nafziger in the K. C. Athletic Club Building Association in the sum of $1,000, we wish to give you the following information:

"The Continental Building Company agreed with the Board of Directors of the K. C. A. C. in the original Membership Campaign to refund to all holders of said bonds the principal of these bonds, provided that the bondholder joined the new Club prior to July 1, 1922, which Mr. Nafziger did, without interest on the principal. Therefore, the interest coupons attached to the bonds will not be paid. However, the principal will be paid according to the terms and provisions which were made in the original proposal.

"You will understand that when this property was sold at the receiver's sale these bonds were legally outlawed and the Board felt that the proposition of the Continental Building Company at that time was very fair and just to the holders of the Second Mortgage Bonds. These bonds will be paid off at the rate of 10% per year at least, starting at the end of the second year after the Club is in operation and will be paid to all registered holders as of July 1, 1922, who joined the new Athletic Club.

"We trust that this is the information you desire.

"Yours very truly,
"The New Kansas City Athletic Club
"L. M. Hermelink, Secretary."

Hermelink said he discussed these inquiries with Mr. Fitch and was told by him what to write, but Mr. Fitch denied this. Mr. Fitch testified, on cross-examination, as follows: "Q. Did you ever intend to pay these bondholders after the 1st of July, 1922? A. It seemed to me very probable that we would not have to pay them, but I think that at that time it had not been determined whether we would be obligated or be liable to them or not. I do not see how it could have been determined at that time." On cross-examination, Mr. Jones testified, as follows: "Q. When July 1st came around and they did not have the 3,000 applicants who had paid their $200, you considered your obligation to the bondholders was at an end? A. We did. Q. That part of the contract had not been complied with? A. It had

not, most emphatically. Q. You never from that time on intended to pay these bondholders because of that? A. No, we were still willing if they got 3000 members, to pay the bondholders. We were willing, there isn't any question about that. . . . The COURT: By what time? A. By the time the club opened. The COURT: That is by September 1, 1923? A. Yes, as a matter of fact, Judge, we have always felt that if this thing became a financial success and got to the place where we could afford to pay these bondholders, we were willing to do it; but we did not dream of anybody expecting us to pay them after the thing was a total failure." Mr. Jones also said: "As soon as we committed ourselves as to building this club and started building it, we had to open it." It was unquestioned that Fitch and Jones did provide a club building and equipment, which fully complied with their agreement. Mr. Fitch, in a letter to Mr. Swinney to obtain a loan for defendant shortly before the building was opened, said:

"$600,000 was expected to be raised from the sale of three thousand memberships at $200.00 each and of this expected amount approximately $400,000 has been realized and the balance is being paid in monthly on the installment basis, and we confidently expect by the first of the year that the balance of this expected $600,000 will be in hand. . . . We did not, however, anticipate that at this time we would be $200,000 short in collecting the Membership Fees and it is to relieve us of this temporary shortage that we are requesting from you a $200,000 loan to run for a period of six months. . . . We entered upon this venture feeling then, and we still feel that the investment would yield a fair return. . . . We have set a minimum estimate upon our net earnings, after all charges of every kind except interest, of $300,000 per year."

Defendant's contentions are that "the contract is divisible and is distinct as to (a) subject matter, (b) parties, (c) consideration, and (d) of performance, as between the owners and applicants upon the one hand and the owners and bondholders upon the other;" that "unless three thousand applications were secured by July 1, 1922, who paid the membership fee of two hundred dollars each, or a total of $600,000, by September 1, 1923, there was no liability" to the bondholders; that "the requirements of membership were not met or complied with;" that "the Guaranty did not affect nor to any extent or in any particular revive the already expired and terminated contract with the bondholders and had no relation to the separable contract contained in Paragraph four (4) of the Proposal;" and that "the acts of the owners in proceeding to erect, equip, open and maintain the club" and in taking the money held by Mr. Swinney did not amount to "a waiver of the membership requirements fixed by the Proposal as a condition to liability to pay the bonds." They further say that "if it should be decided that the Guaranty effected an

extension of time, . . . then unless three thousand applications were secured by September 1st, 1923, and then or thereafter the applicants fully paid the membership fee of two hundred dollars each, or a total of $600,000, there is no liability.''

Plaintiffs, however, contend that ''the contract, evidenced by the Proposal, between the owners . . . and the applicant bondholders, is single and entire and is in no sense divisible or apportionable;'' that ''the correct construction of the language used in Paragraph (4) of the Proposal made to the bondholders and the representations made in connection therewith is, that if three thousand applications were received and accepted by the owners by July 1, 1922, and the building was completed for use as an Athletic Club, the owners would pay off the principal of the old bonds to the registered owners thereof who, by accepted applications, became members of the new club on or before July 1, 1922;'' that ''the total membership requirements of Paragraph (4) of the Proposal were waived, (a) by the acts of the owners themselves, and (b) by the express terms and language of the guaranty agreement of July 1, 1922;'' and that ''the requirements of the original Proposal as to total membership were fulfilled except only as to time; and the time requirement was waived by the owners.'' The questions decisive of the case, therefore, are: First, is the contract evidenced by the Proposal entire or severable? Second, what is the true meaning of the requirement made in Paragraph 4 ''*as to total membership*?;'' and third, what was the effect of the guaranty and the subsequent acts of the owners upon the original proposal to the bondholders?

■ It is apparent that the most important question in the case is whether the contract is entire or severable. Severable or divisible contracts ''are, in legal effect, independent agreements about different subjects although made at the same time.'' [6 R. C. L. 983, sec. 351.] As in any construction of written instruments ''it is very difficult to lay down a rule which will apply to all cases and consequently each case must depend very largely on the terms of the contract involved.'' (13 C. J. 561, sec. 525); and the question is primarily one of intention which ''is to be determined from the language which the parties have used and the subject matter of the agreement.'' [13 C. J. 562, sec. 526.] Tests which are used for aid in determination of this question, although no one of them is alone sufficient to decide the question, are whether the subject matter of the contract is divisible, whether the consideration is entire or apportioned, whether the obligation is due at the same time to the same person, and whether the contract is to take the whole or none. [13 C. J. 563, secs. 527-528; 6 R. C. L. 858, sec. 246.] Williston (Contracts, 1652, sec. 863) says that the essential test ''can be nothing else than the answer to an inquiry whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever if any

promise or set of promises were struck out." In the American Law Institute's Restatement of the Law of Contracts, page 385, section 266, it is said: "A contract is divisible where by its terms, 1, performance of each party is divided into two or more parts, and, 2, the number of parts due from each party is the same, and, 3, the performance of each part by one party is the agreed exchange for a corresponding part by the other party." [For illustrative Missouri cases see Johnson v. White, 2 Mo. 223; Cantwell v. Crawley, 188 Mo. 44, 86 S. W. 251; State ex rel. Dolman v. Dickey, 288 Mo. 92, 231 S. W. 582; Marks v. Davis, 72 Mo. App. 557; Wright v. Kansas City, Ft. Scott & M. Railroad Co., 141 Mo. App. 518, 126 S. W. 517; Knapp v. Strauss (Mo. App.), 58 S. W. (2d) 805, 1. c. 809-810, where cases from many states are colated; see, also, note 71 A. L. R. 479, and Williston on Contracts, 1046-1056, secs. 861-864; many illustrative cases are also cited in 13 C. J. 562, note 53; for more recent cases in other states discussing the question, see Cosden Oil Co. v. Scarborough, 55 Fed. (2d) 634; Ireland v. Craggs, 56 Fed. (2d) 785; Dixon v. Smyth Sales Corp. (N. J.), 166 Atl. 103; Monaco v. Peoples National Bldg. (Cal.), 299 Pac. 548; Benchley v. Durkee Famous Foods (Cal.), 17 Pac. (2d) 1020; Pettigrove v. Corvallis Lbr. Mfg. Co. (Ore.), 21 Pac. (2d) 198; Burkhart v. Brownfield (Tex.), 33 S. W. (2d) 885.]

It is, of course, apparent that the contract here is divisible as to subject matter and parties. There is one agreement as to membership in a club, which is to be organized and housed, and another as to payment of bonds which were not obligations of the owners making the proposal. There are likewise two classes of persons to whom these proposals are made, namely, applicants who hold second mortgage bonds of the old club and applicants who do not. The remaining and decisive question is whether or not the consideration is entire or expressly or by necessary implication apportioned. Plaintiffs concede "that the Proposal, having been made by the owners both to applicants generally and also to bondholders, was dual in a sense, and therefore may have been separate as between the owners and applicants generally and as between the owners and bondholders." They say, however, that "the contract between the beneficial plaintiff bondholders in this suit and the owners was single and entire," because the consideration moving from the bondholders to the owners was not divisible or separable and cannot be apportioned between the two things they were to receive from the owners. They inquire as "to what part of the consideration moving from the bondholder applicants may the two covenants of the owners, i. e., to complete and open the building for use as a club, and to pay off or refund the principal of the bonds, be apportioned?" We think the answer to this question is obvious. For the $200 which the bondholder applicants were to pay, they were to get exactly what every other ap-

plicant who paid it was to get, namely, a membership in the club. The consideration for the agreement to pay their bonds was that a certain result be reached through the aid of their "earnest cooperation," namely, a total membership of 3000 resident members, who would pay $200 each, so that the sum of $600,000 would thereby be raised for the owners, and the club would start with 3000 members who were to pay $80 annual dues. If I agree to buy my neighbors' spring pigs at a certain price if they are brought to 200 pounds weight by September first, could he make me take them, if they only weighed 190, merely because I sold him $200 worth of corn to feed to them at the same time I agreed to buy them? Is it not unreasonable to say that the owners meant to give one applicant only a membership in the club for his $200, but meant to give another, who signed exactly the same application, not only the same membership but also $5000 besides, for his $200? Something more must have been expected of the latter than merely $200. A bondholder was to get just as much for his $200 as any other applicant and no more, but by becoming a member he also became eligible to complete the other contract proposed, that is to get his bonds paid by making sufficient effort so that, by the efforts of all, a paid up total resident membership of 3000 would be reached. It was meant to make it to the interest of the bondholder·applicant to see that this result was reached because that determined whether or not his bonds would be paid. We hold that the contract with the bondholders for payment of their bonds was separate, severable and divisible from the contract with applicants for membership in the club; and we likewise hold that the contract was separate, severable and divisible between the owners and the bondholders for membership in the club, from that between them and the bondholders for the payment·of their bonds.

There remains for consideration the meaning of the language of the proposal, and the effect of the guaranty and other subsequent acts of the owners. For the determination of these questions, "it is the primary rule of construction of contracts that a contract must be construed as a whole, giving effect to every part, if it is fairly and reasonably possible to do so, and to thus determine the true intention of the parties. [Myers v. Union Electric Light & Power Co., 334 Mo. 622, 66 S. W. (2d) 565.]" [Thomas v. Utilities Bldg. Corp., 335 Mo. 900, 74 S. W. (2d) 578.] The only requirement of Paragraph 4 of the proposal which is in question is the following, to-wit: "If the *requirements* of this proposal *as to total membership* are complied with." What are "the requirements of this proposal *as to total membership*?" This can only mean the requirements set out in Paragraph 1 because that is the only part of the proposal which states membership requirements. Paragraph 1 says that the owners will expend $600,000 above the first mortgage loan (or the amount thereof required and it is not questioned that it was all required) to completely

furnish and equip an athletic club building provided *3000 eligible persons shall,* prior to July 1, 1922, *be enrolled* as resident members in the manner *and each making the payments and accepted application hereinafter provided,"* which payments shall be used to reimburse the owners. While this proviso is awkwardly worded, we think its meaning is clear. If we rearrange it so that it will state its requirements in proper order and give effect to everything it says it must mean that the *requirements as to total membership* are that 3000 eligible persons *shall be enrolled* as resident members prior to July 1, 1922, in the manner hereinafter provided, namely, by making the accepted application hereinafter provided and paying twenty-five dollars therewith; and that such 3000 eligible persons, so enrolled prior to July 1, 1922, shall have complied with the requirements for members by *each making the payments* hereinafter provided, namely, in paragraph 2 and in the application. Plaintiff's construction of the proviso leaves out of consideration entirely the requirement of *"each making the payments"* which can only mean each member paying "at least $25 with application and the remainder in installments thereafter of $25 each . . . beginning August 1, 1922, until the entire amount is paid" as stated in paragraph 2 of the proposal and as required by the application.

Plaintiffs call attention to paragraph 1 of the application which says that "upon making on or before July 1, 1922, of 3000 applications" the owners "shall proceed to complete and equip the steel frame structure at above location substantially as originally planned." We think this only means that the owners agreed to proceed, that is, commence the work immediately after July 1, 1922, if 3000 applications were made on or before that date. They could not wait and did not intend to wait until after seven monthly installments were paid (which would have been Feb. 1, 1923) before *proceeding* to complete the building. If they had it could not have been finished by September 1, 1923; the time they agreed to and were required to complete it in order to be entitled to the money which the applicants paid for their memberships, and which "otherwise shall be returned . . . to said applicants." Moreover, the application was not a contract with the bondholders and said nothing about bondholders or bonds. It was a contract only for building the club building and maintaining a club therein. The contract with the bondholders was contained in paragraph 4 of the proposal which was effective only if the requirements of paragraph 1 "as to total membership" were met. We think it is clear that applications and memberships did not mean the same thing; that the agreement as to applications referred to commencing the work; and that the agreement as to memberships referred to paying the bondholders. The agreement as to memberships also referred to the obligation to open the club but since these agreements were severable, waiving the requirement as to membership, as to opening,

did not necessarily waive it as a condition for paying the bondholders.

Likewise, when we consider the purpose for which the proposal was made, it is apparent that the owners meant by it to assume payment of the bonds only if they got 3000 members who paid in $600,000 by the time they were entitled to the money, to-wit, September 1, 1923. That was the estimated cost of completing and furnishing the building and one of the principle purposes of getting 3000 members was to raise this $600,000 so that the owners would get their money back. The building had to be paid for with money, not applications. The owners' reason, for making the proposition to the bondholders, was to get their aid in raising this amount of money for them. Of course, they also expected that if they started with 3000 paid up members they would make an annual profit from their dues and patronage sufficient to be able to pay the installments to the bondholders out of their profits, but they were taking their chances on that. They were not taking chances, so far as their obligation to pay the bondholders was concerned, on whether they got $600,000 from the applicants, because they did not agree to pay their bonds unless the requirements as total membership shall be met and one of these requirements was that there should be 3000 applicants "each making the payments . . . hereinafter provided." In short, the proposal means commence work on getting the applications, pay the bondholders on getting the money. There is nothing in the letters of Mr. Walker or Mr. Sebree to contradict this construction. The purport of these letters was that all (bondholders or others), who paid $200 to become members, would get a club or would get their money back. They did not promise the bondholders that their bonds would be paid unless the proposal of the owners was fully complied with, and they merely advised of and referred to the proposal. Of course, the terms of the written proposal could not be changed by verbal statements of enthusiastic membership solicitors.

█ It also seems to us that the guaranty signed on July 1, 1922, is a complete recognition of the purpose to raise $600,000 for the owners, rather than merely 3000 signed applications. Paragraph 1 makes the proposal a part of the guaranty by reference. It does not change any of its terms and conditions but takes it as it is. Paragraph 2 states that "it is the desire of the parties hereto that the terms of said proposal shall be complied with and that said enterprise be developed and carried into effect in accordance with the terms of said proposal." Paragraph 3 says that "the owners shall proceed forthwith to complete, furnish and equip the said structure referred to and described in said proposal as an athletic club building in substantial accordance with the said proposal and at an estimated cost of substantially $2,200,000." Both paragraphs 2 and 3 refer to completing and furnishing the building and not to bondholders but they

do contemplate that the same amount of money will be raised for the owners as originally intended. Paragraph 4 states:

"It is the intent and purpose of the parties hereto that the membership of the said Club shall reach the number of 3000 on or before the opening of the Club which shall not be later than September 1, 1923; and to that end the Guarantors promise that three-fourths of the number of applications required to bring the present number of applications, which is not less than 2000, up to 3000 shall be forthcoming and submitted to the Owners on or before the opening of the Club. . . . And that if there is a shortage of such acceptable applications at that time they will then pay to the Owners the sum of $200 for each of the applications required to make up that shortage; . . . the individual liability of each Guarantor shall be limited to $5,000.00."

These guarantors agree to be liable for money and not merely applications. They agree to pay $200 for whatever shortage there may be and their liability is fixed at $5000 each and not at 25 applications. As shown also by the next paragraph, it is still intended that the membership requirement shall remain at 3000 and that the owners shall receive $600,000. It should be noted that there was, in fact, no shortage on this guaranty because more than 750 of the applicants secured after July 1, 1922, did pay in full. Paragraph 5 provides:

"In case such payment is made by the Guarantors the members admitted to the Club after such payment shall be required to pay for admission the sum of $200 apiece . . . applied monthly to reimburse the Guarantors pro-rata . . . and after such amounts have been refunded in full to the Guarantors, and until the membership shall have reached 3000 on which each member shall have paid for admittance the sum of $200, the Owners shall be entitled to and shall have such admission fees and payments until they have received from that source the full sum of $600,000 contemplated by the said Proposal."

The guaranty was not a new proposal. It only guaranteed part of the requirements of the proposal. All applicants became parties to the proposal but they did not all become parties to the guaranty. The guaranty says nothing about bondholders. How does it change the proposal as to them? It specifically reaffirms and adopts all of the terms of the proposal except that in consideration of a guaranty that 750 more acceptable applications will be obtained or paid for by September 1, 1923, the time for obtaining 3000 members was extended until September 1, 1923; that the owners took their own chances on 250 of these members being obtained, and that they also took their chances on those who had already applied paying in full; but that was only so far as completing and opening the club at that time was concerned; and this was true because when they accepted the guaranty they then agreed to build the building and open a club therein. It

does not follow that they took their chances on obtaining the stipulated membership so far as paying the bondholders was concerned. The guaranty still definitely stated that it was "the intent and purpose of the parties *that the membership of said club shall reach the number of 3000* . . . not later than September 1, 1923;" and it was still provided that "the owners shall . . . have such admission fees and payments until they shall *have received from that source the full sum of $600,000 contemplated by said proposal.*" The evidence is that not only did they never receive this amount from applications for membership made prior to September 1, 1923 (there was about $100,000 shortage from that source); but they have never even received it from all memberships obtained prior to this trial.

▮ Since the contract was severable or divisible as between the applicants for membership (whether bondholders or not) and the bondholders, it follows that there was no waiver of any of the provisions of the contract with the bondholders, except as to time to meet its requirements "as to total membership," either by taking a guaranty that 750 more memberships would be sold, or by releasing such guaranty before it was fully performed, or by opening the club, or by taking the money which had been paid on memberships up to the time the club was opened. Neither do the letters of Mr. Hermelink to the inquiring bondholders amount to either a change in the contract with the bondholders or a waiver of its terms. There is no evidence that he had authority to make a new contract with them or that he did do so, and his letters cannot be construed as a waiver, even if Mr. Fitch authorized him to answer them, because they refer to the proposal (state that "the principal will be paid according to the terms and provisions which were made in the original proposal"), and it still remained probable at the time he wrote them that the terms and provisions thereof might be fulfilled within the required time, as it had been extended by the guaranty. ·

To summarize our conclusions, the proposal to the bondholders was: Buy a membership in the club (which costs you and everyone else $200) and you will get a club or your money back; help us raise $600,000 by getting 3000 paid up members and if we get that amount (which will pay for the building and equipment so that we can start the new club free from any debt but the first mortgage), we will pay you what you lost when the old club failed. The modification made by the guaranty was: Since we have now obtained over 2000 applications for memberships (none of which have been yet paid for) and have been guaranteed $150,000 (by 30 guarantors assuming $5000 each), we will commence the building and take more time to raise the $600,000 (which it will cost us) by extending the time to sell memberships; all applicants are now guaranteed a club for their money which we will operate for ten years whether it pays its way or not; if we do raise the $600,000 from memberships sold before September 1,

1923, the bondholders will still get what they lost. It is argued that the bondholders were given no chance to accept this new deal, but they had never met the terms of the old deal and they still had an opportunity, under the new deal, to get their money by meeting the original terms. How could they have been hurt by it? It added nothing to the requirements they had to meet and gave them more time to do it. If A owes me a note for $1000 with eight per cent interest, which is due, does A owe me any less if I give him another year to pay it in consideration of B signing a separate guaranty that he will stand good for $750 of it? How can we say that the owners undertook to pay what the bondholders had already lost, if they did not get money from memberships to pay the cost of the building when their agreement to pay them was based upon that? When they started to building the building as a club, they knew that they could not, after completing it as such, then change their minds and build it as an office building. When they accepted the guaranty they intended to take their chances on collecting the money from memberships, as far as opening it and operating as a club was concerned, because they agreed therein to build a club building and operate a club in it for ten years; but they did not also bind themselves to pay the old bonds unless they got $600,000 from the sale of memberships. The guaranty still required 3000 memberships to be sold and paid for in full.

The judgment is reversed.

PER CURIAM:—The foregoing opinion by HYDE, C. in Division One, is adopted as the opinion of the Court en Banc. All concur.