## The GLEN O'BRIEN MOVABLE PARTITION COMPANY, INC., a corporation, Respondent,

v.

## David H. McMULLEN d/b/a McMullen and Company, Appellant.

### No. KCD 30239.

Missouri Court of Appeals, Western District.

Nov. 3, 1980.

Steven J. Borel, Stubbs & Mann, P. C., Kansas City, for appellant.

John E. Craig, Bernard D. Craig, Levy & Craig, Kansas City, for respondent.

Before HIGGINS, Special Judge, Presiding, WELBORN, Special Judge, and SWOFFORD, Judge.

SWOFFORD, Judge.

This is an appeal from a judgment in a case tried to the court below without a jury. The respondent–plaintiff, Glen O'Brien Movable Partition Company, Inc. (hereafter O'Brien), filed suit against appellant–de-

fendant, David H. McMullen d/b/a McMullen and Company (hereafter McMullen), to recover the contract price for certain office furniture and office partitions which O'Brien had sold to McMullen, or, in the alternative, O'Brien asks for damages for wrongful non–acceptance or repudiation of such sales contract under the Missouri Uniform Commercial Code. McMullen counterclaimed for damages for alleged breaches of express and implied warranties in connection with the furniture and partitions covered under the contract.

The court below ruled that the contract was severable as to the furniture, on the one hand, and the partitions on the other, and found that some of the office desks were in damaged condition when delivered and gave McMullen credit on the contract price for the furniture, and directed that such furniture (then in storage) be made available to O'Brien. The Court further found for O'Brien with reference to the office partitions holding that they were to the specifications of and were installed in accordance with the contract, and were not defective, and entered judgment in favor of O'Brien in the sum of $3,490.24. The Court found against McMullen on his counterclaim. Judgment was entered according to these findings, and McMullen appealed. O'Brien took no appeal from the judgment.

The plaintiff, O'Brien, offered the testimony of John Boner in support of its claim. Boner at the time of his testimony was Division Manager of the O'Brien Company, stationed in St. Louis. In 1976, he was working for O'Brien at Kansas City. The principal business of O'Brien was the sale, manufacture and installation of movable office partitions and as an incident thereto handled some new and used office furniture and equipment. Boner stated he was not an architect or engineer.

He stated that in the latter part of 1976, he was contacted by one Tina Burton, who he understood was office manager for the McMullen firm of Certified Public Accountants. This firm was preparing to move their offices from downtown Kansas City to vacant office space at 4010 Washington in the Westport area of the city, and was interested in discussing the O'Brien movable office partitions. Most of the subsequent negotiations between O'Brien and McMullen were conducted by Burton, except that Boner also had dealings with David McMullen, the owner, and one Roger Novak, who the witness understood was a partner in the McMullen Company.

Boner examined the office space at 4010 Washington, which was then open space without separation into offices by partitions or walls, obtained the overall measurements, furnished advertising brochures showing the O'Brien products, and over a period of approximately six weeks, had seven planning meetings with Burton and McMullen. Boner prepared at least two, and possibly more, floor layout plans drawn to scale, various corrections and changes were made in these plans at the "customer's" (McMullen's) request, and, a final plan was agreed to as a result of these efforts. Plaintiff's Exhibit 2.

This layout showed the allocation of the space as to the various offices, the location, height, width and color of the movable partitions, and other detail as to the use of the space.

During the course of the conferences and planning, Boner suggested to McMullen that he might be interested in purchasing from O'Brien seven Oxford desks and pedestals (an attachment to the desks for drawer space) which O'Brien had taken in trade from another customer and which were stored in the O'Brien factory. This transaction will be more fully detailed hereafter. Also, McMullen agreed to purchase two Formica bookcase units from O'Brien. These units are referred to in the record as "flippers".

These rather extended negotiations resulted in O'Brien executing a written proposal dated October 5, 1976 to McMullen to furnish the partitions or screens "per attached plan" and the items of furniture for a lump sum of $5,024.00, without any dollar breakdown as to the categories or items involved. As a part of this proposal and as a condition thereto, the following is stated:

"3. GUARANTEE. The Glen O'Brien Movable Partition Co., Inc. guarantees its workmanship and material supplied by it to be free from defects for a period of one year from date of completion. * *"

This proposal was accepted by McMullen, and O'Brien proceeded to manufacture the partitions. Boner testified that he made no guarantee that McMullen would like the layout of the offices which were in accordance with the decisions reached in joint planning conferences, and that O'Brien delivered what McMullen ordered.

As to the desks and pedestals, he stated that these were used by another client of O'Brien's, the United Telephone Company, for approximately 6 months, and that he priced them to McMullen at $190.00 each in their "as is" condition. McMullen testified that Boner represented these desks to be "as good as new" and that the price was a great bargain. Ms. Burton came to the O'Brien premises to inspect the desks which were stored in their factory or warehouse stacked one on top of another and somewhat inaccessible. Boner had his factory people place one or two of these where Ms. Burton could inspect them, which she did. He offered to have all of them moved to a position for her inspection, but she declined. Later, David McMullen came to O'Brien's and inspected one of the desks in order to measure the size of its working surface to see if it was of sufficient size to accommodate his accountancy working papers. All of the desks and pedestals were the same size and matching as to color.

The desks were delivered to McMullen's new office on October 14, 1976, on the weekend of that Company's move from downtown to the Washington Street address. The 19 partitions or screens were delivered and installed at that address on October 26, 1976, at which time Roger Novak, an associate of McMullen, called Boner's attention to the defects in the desks and pedestals. Novak, however, signed an acceptance of the *proposal* on behalf of McMullen on that date.

At that time, the two bookcases, at $100.00 each, and one screen at $138.00, had been eliminated, so that the total sale price, as shown on the final proposal, was then $4,686.00. Boner testified that of this amount $1,330.00 represented the price of the desks and pedestals, and $3,356.00 the price of the partitions. Boner testified that he had received no complaints about the desks until the partitions were delivered.

Mrs. Tina Mattix (nee Burton) was called as a witness for O'Brien. At the time of her testimony, she was no longer employed by McMullen, having been terminated there the end of November, 1976. She was in charge of the details of the move of McMullen from downtown to the Washington Street office. She stated her first contact with O'Brien was sometime in September, 1976, and thereafter she had 4 or 5 meetings with Boner. Her testimony corroborates that of Boner in substantial respects. She stated that Boner worked hard on their problems, made no complaints about requested changes, and his services were of excellent quality.

As to the desks and pedestals, she stated that when she examined a sample at the O'Brien plant, her impression was that it was in good condition, and she also had the impression that the seven desks were in good condition when they were delivered to the new office. Except for a few hairline scratches, they were in exceptionally good condition.

As to the movable partitions, she stated that she was taken through the O'Brien offices and shops; viewed the fabrics and material; the design and construction of the partitions were explained to her; and she "worked with the layout people". She was familiar with the final layout plan for the McMullen office. However, all final decisions relative to the matter were made by David McMullen, and O'Brien delivered and installed what McMullen ordered. She was present when Novak complained about the desks and pedestals.

Mattix was fired by McMullen and was terminated in November, 1976, around Thanksgiving, at which time some of the

O'Brien equipment was still in use at the McMullen office. Mrs. Mattix filed a complaint against McMullen before the National Labor Relations Board, but the disposition of such complaint does not appear. She also requested a statutory service letter from McMullen, but the response to such request or further proceedings with reference thereto, if any, was not shown.

In defense of O'Brien's claim and in support of his counterclaim, the defendant offered the testimony of David McMullen, the owner of the company. He testified as to his contemplated move from downtown to Westport; that he wanted to "wind up" with a professional accounting office arrangement; that Boner of the O'Brien Company was represented to him as a professional office planner; that he, McMullen, was not an engineer and knew little about office or design planning; and, that he relied upon Boner for that expertise. He had several talks with Boner and the end result was the floor plan drawn by Boner, Plaintiff's Exhibit No. 2.

With reference to the desks, McMullen stated that he only saw one of them for inspection prior to delivery upon the occasion when he measured the top to ascertain if it contained sufficient work space for his accountancy needs. Boner represented the desks to be "like new" and that if they were not satisfactory, he would take them back. McMullen relied upon those representations.

Subsequent to the delivery of the desks on Friday, October 14, 1976, during the weekend move of the offices (which move was as "hectic as could be" because of the large amount of accounting records, files, and the like) it was found that there were dents, chipped places, and scratches on the desks, some of the drawers in the pedestals would open and some would not, there were no keys furnished, and generally, they were dirty, in bad condition, and practically unusable for his purposes.

Mr. Novak testified that on Monday, October 17, 1976, he inspected the desks and pedestals and noted the defects described by McMullen, and also that some of the pedestals were in such bad shape that they would have to be replaced. He called Mr. Boner and told him of these conditions. These events transpired before the office partitions were installed by O'Brien.

The partitions were delivered and installed on October 26, 1976, and David McMullen testified that he was "basically dissatisfied with everything", including the fact that the whole project and design just "didn't work". His basic reason for this was that the partitions created a "maze" and were set at such angles as to make moving around in the office very confusing and difficult, to the extent that some of his clients expressed adverse reactions. Further, he stated that the partitions were not as soundproof as represented; that some of the fabrics on the panels were not properly applied, in that they were stretched so that they creased or wrinkled; and that the panels varied in height and width, and that led to unsightly appearance of the office and led him to believe they were not custom designed, as represented.

Witness Novak testified to like effect, and stated that the partitions were not built to scale as shown by the floor plan layout. He also stated, in somewhat more detail, the resulting difficulty in moving around the office.

Novak telephoned Boner when the installation was finished and expressed McMullen's dissatisfaction with the results of the project, and two days later, Boner came to the McMullen office and he, Novak, Ms. Burton and David McMullen engaged in extended conversations about the situation, and Boner was told that McMullen would not accept the goods. Some attempt was made to adjust the matter. David McMullen, having rejected the whole project, offered to pay $750.00 to reimburse O'Brien for the labor involved and return all the items, and Boner offered to accept 30% of the total charges to compromise the matter. No agreement was reached.

Under date of November 2, 1976, McMullen sent a letter to O'Brien rejecting the 30% offer of settlement upon return to O'Brien of the desks, pedestals and partitions as "totally unacceptable" and set forth

in detail McMullen's reasons for rejection of the goods and the office design. In this communication, O'Brien was advised that the "products" are to be removed from the McMullen offices no later than November 4, 1976. O'Brien did not remove its "products" and they were put into storage by McMullen. Under date of November 19, 1976, counsel for McMullen wrote O'Brien again formally rejecting the goods and revoking any claimed acceptance thereof under the provisions of Missouri U.C.C., advising that the goods were in storage and asking for instructions with regard to their disposition. Attached as an exhibit to this letter was a long list of detail as to the damaged furniture and the complaints with reference to the partitions.

Both the letters of November 2, 1976 and of November 19, 1976 (Defendant's Exhibits 7 and 8) were offered in evidence and received, without objection.

The defendant introduced the testimony of a Don Niemackel, a licensed architect, who had observed the McMullen offices upon the completion of the O'Brien work and who subsequently redesigned those offices with a new layout plan. Over the objection of counsel for O'Brien that this witness' testimony was "totally irrelevant", the trial court permitted such objection as a continuing one, without the necessity for repetition.

Niemackel testified that the final result of the work by O'Brien differed from the original layout design (Exhibit No. 2) as it affected office "traffic" and "circulation" because of space allowance and "tightness". He redesigned the office in a more functional manner.

As to damages on the defendant's counterclaim, David McMullen testified that due to this trouble and the inability to properly function in the new office, the McMullen Company had productive time loss of at least $3,000.00 to $4,000.00.

■ After both sides had rested, the Court stated that the testimony of the architect, Niemackel, regarding the inadequacy of the O'Brien office design was not within the scope of the issues as made up by the pleadings and would be disregarded. The defendant made no request to amend. However, this testimony was preserved in the transcript and is now before this Court and will be considered under Rule 73.01–3(c) in this appeal. It has been concluded that the pleadings of both parties are broad enough as related to "services" and "labor" to permit the introduction of evidence as to the inadequacy of O'Brien's office design in the absence of motion for more definite statement, bill of particulars, or other discovery process. Also, other evidence was introduced by defendant, without objection, in this area of fault, as will hereafter appear, and the pleadings should be considered amended to conform to such evidence as provided by Rule 55.33(b). In the light of this conclusion and the result reached herein, McMullen's Point IA and B (wherein he raised the claim of error on the part of the trial court in excluding and disregarding the testimony of witness Niemackel) becomes moot, as an assignment of error. *Miller v. Gayman*, 482 S.W.2d 414, 419–420 [11] (Mo.1972).

The appellant raises four additional assignments of error.

Point II charges the trial court with error in ruling that McMullen had no right to reject the partitions because the evidence showed that the partitions were not free from defects as guaranteed by the plaintiff; that the installation thereof resulted in a "congested" office and unsightly appearance; and, the partitions were not installed to scale according to the plan of the office layout.

Point III asserts that the court correctly ruled that the desks and pedestals had been timely rejected but erred in finding that the defendant was liable to pay for the partitions because the contract was not severable. Under Section 400.2–601 RSMo 1969, the defendant asserts he had the right to reject all of the goods because of the non-conformity of any of them.

Point IV, upon the assumption that the defendant owed any damages (which he denies), asserts that the trial court erred in

awarding the plaintiff a sum intended to reflect the contract price of the partitions because the correct measure of damages applicable is the difference between the market price of the goods at the time of tender and the unpaid contract price.

Point V charges error of the court in finding against defendant on his counterclaim as against the weight of the evidence, which demonstrated that the defendant had suffered damage by reason of the plaintiff's breach of contract.

■ It is recognized that the resolution of this appeal is governed by certain rules and restrictions as to the scope of review. Under Rule 73.01(3)(a), this Court must "review both the law and the evidence as in suits of an equitable nature". Under the mandate of the decision in *Murphy v. Carron*, 536 S.W.2d 30, 32 [1–3] (Mo.banc 1976) and subsequent decisions, the judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. When the law and the evidence in the case at bar are considered and the rules of *Murphy v. Carron*, supra, applied, rule 84.14 requires this Court to dispose finally of the case "unless justice otherwise requires", including the giving "of such judgment as the court ought to give".

■ A careful study of the record, briefs and authorities cited and independently explored leads this Court to the conclusion that the one decisive issue for determination on this appeal is whether or not the trial court erred in holding that the claim as to the furniture on the one hand, and the claim as to the partitions on the other hand, were severable under the facts in this case. In so doing, the court below misapplied the law to the facts in this case.

The decisional law and the tests or guidelines to be applied in determining whether or not a contract is entire or severable have been long established in this state and have been carried forward under the Uniform Commercial Code (hereafter U.C.C.) which

was adopted in 1963 and effective July 1, 1965. In the case of *Rexite Casting Co. v. Midwest Mower Corporation*, 267 S.W.2d 327 (Mo.App.1954), the court stated at l.c. 331–332 [8]:

"* * * Whether a contract is entire or severable is a question of intention, to be gathered from the language used and the subject matter of the agreement. Tests which have been applied are whether the subject matter of the contract is divisible, whether the consideration is entire or apportioned, whether the obligation is due at the same time to the same person, whether the contract is to take the whole or none, and whether the parties assented to all the promises as a single whole so that there would be no bargain whatever if any promise or set of promises were stricken out. * * *"

The *Rexite* court further stated, l.c. 332:

"* * * The fact that the contract concerned two separate articles * * * does not necessarily make the contract divisible, where the two are so interrelated that one is actually the counterpart of the other. * * *"

In the case of *Lopp v. Peerless Serum Company*, 382 S.W.2d 620, 624 [1] (Mo.1964), the court said:

"* * * The question of whether a contract is entire or severable is primarily one of intention which 'is to be determined from the language which the parties have used and the subject matter of the agreement.' *Swinney v. Continental Bldg. Co.*, 340 Mo. 611, 102 S.W.2d 111, 120 [1, 3] where it is also said, quoting Williston, Contracts, 1652, Sec. 963, that the essential test 'can be nothing else than the answer to an inquiry whether the parties assented to all the promises as a single whole, *so that there would have been no bargain whatever if any promise or set of promises were struck out*' * *" (Emphasis the Court's)

See also: *Katz v. Pulaski Savings and Loan Association*, 546 S.W.2d 24, 28 [4] (Mo.App. 1976); *State ex rel. Dolman v. Dickey*, 288 Mo. 92, 231 S.W. 582, 585 [5] (Mo.1921).

Under Section 400.2–105(6) of U.C.C., RSMo 1969 (1978), such a single or entire sale of goods is defined:

"'Commercial unit' means a unit of goods as by commercial usage is a single whole for *purposes of sale* and division of which materially impairs its character or value on the market *or in use.* A commercial unit may be a single article * * * or a *set of articles* * * * or any other unit *treated in use* * * * *as a single whole."* (Emphasis added)

Applying the above decisional standards and tests and this statutory definition of "commercial unit" to the facts apparent from the record in the instant case, the following factual conclusions are clearly and substantially supported by competent evidence.

1. The intention of the parties at all times is clear as are their respective roles in the transaction. The O'Brien Company held itself out to the public, including McMullen, as engineers and manufacturers of the movable partition (also called "space change" and "quick change" landscape screens) and experts in office space planning. It also, upon occasions, handled office furniture, as in this case. Its brochure (Exhibit 6), furnished to McMullen in the initial stages of negotiations, contained such statements as:

"Proven performance—engineered and developed from actual installation experiences since 1954 by Glen O'Brien Partition Co."

and

"* * * Twenty years of practical experience along with continuing design and engineering refinements stand behind O'Brien partitions * * *"

This and other brochures introduced in evidence contained many multi–color photographs showing various elaborate office arrangements employing the use of O'Brien partitions.

John Boner, O'Brien's representative throughout the transaction with McMullen, was District Manager for the company at St. Louis at the time he testified and had been with the company for 12 years. He started with O'Brien in Kansas City working in the drafting department and stated he later became head of the Engineering Department and, still later, was Assistant District Manager at Kansas City before he was moved to St. Louis as District Manager. While he stated that he was not a qualified engineer or architect, it is clear that his work necessarily, and by its very nature, involved office planning for customers in that, he related the location of O'Brien's partitions to available space and to the needs of his customers. McMullen testified that Boner told him that he (Boner) was an office planner, and he relied upon that representation. Boner's final office plan prepared for McMullen (Exhibit 2) reflects great detail, drafting skill, including the proposed location of the partitions in the McMullen space, their height, width and length, all as related to the placement of the furniture and presents a very professional appearance. His numerous discussions with McMullen and his representatives prior to the final agreement reflected Boner's stated intention to relate McMullen's needs, space and the limitations of his client's budget.

McMullen stated that his desire and intention was to convert the open bare space he had leased for his expanded office into a professional, functional, operative certified public accountant's office, and that from the outset he explained his needs, budget situation and wishes to Boner. McMullen had no training as an engineer, architect or office planner, but devoted his full time to his profession as an accountant. It is clear that, while McMullen and his associates made suggestions and requests as to location, colors, fabric and placement of the partitions and the furniture during the planning conferences, the final plan and office layout drawing (Exhibit No. 2) was prepared by Boner and was approved by McMullen. It is equally clear that it reflected McMullen's wishes and Boner's expertise as a joint effort to accomplish a common goal or objective.

2. Both the final proposal and the later invoice did not allocate the items as to cost

or charges but stated a lump sum to be owing or due from McMullen for the job as a whole. Boner testified that this lump sum reflected the costs of labor and, it may be assumed from the record that it also included an allocation of all items of cost, overhead, Boner's services and other business expenses. However, the lump sum was never broken down as charges for individual items or even categories thereof (even in O'Brien's pleadings) until trial. McMullen testified that he had never been advised as to any such breakdown until he heard Boner's court testimony.

There was ample and substantial evidence to support the finding of the court below that some of the desks and pedestals were damaged and defective; did not conform to the contract; all were matching items of office furniture; and, that by reason thereof, all seven of them were of no value to McMullen. Accordingly, the court's judgment relieved him from any payment therefor and ordered them returned to O'Brien at its expense. As to the partitions, however, the court found that they were free from defects and had been erected in accordance with the layout plan (Exhibit No. 2) which McMullen had approved and rendered judgment against him for the breakdown given in Boner's testimony without any supporting evidence. These findings would leave McMullen with the partitions in an otherwise empty and unusable office and with a judgment against him for approximately $3500.00. Further, these findings entirely disregard the evidence of Novak and Niemackel, that the partitions were not erected to the scale of Exhibit No. 2, and their testimony and that of McMullen that the end result of the project rendered the office a "maze", of weird appearance, and functionally unsuitable–a′ result entirely at war with the avowed intentions of McMullen and Boner as to the objective of the project and resulting contract. The contract was entire and not severable under the principles and standards above noted in *Rexite Casting Co. v. Midwest Mower Corporation*, supra, and *Lopp v. Peerless Serum Company*, supra, and was a "commercial unit" under U.C.C.

■ In such event, U.C.C. provides for certain rights of and options open to a buyer. Section 400.2–601 (U.C.C.) RSMo 1969 (1978) provides in pertinent part:

"* * * if the goods or the tender of delivery *fail in any respect to conform to the contract*, the buyer may

(a) *reject the whole* ; or

(b) accept the whole; or

(c) accept any commercial unit or units and reject the rest." (Emphasis supplied).

If the buyer within a reasonable time after delivery decides to reject the goods, he must seasonably notify the seller. The buyer must be afforded a reasonable opportunity to inspect the goods before he is called upon to exercise the options afforded him. Section 400.2–602 and Section 400.2–606 (U.C.C.) RSMo 1969 (1978); *Stephens Industries, Inc. v. American Express Company*, 471 S.W.2d 501, 504[5] (Mo.App.1977).

■ In the instant case, the undisputed facts show that prompt complaint as to the condition of the furniture was made and further complaints were made when the partitions were delivered and installed on October 26, 1976. Some discussions followed and a formal rejection of the goods in writing was made by McMullen under date of November 2, 1976, within a week from final delivery and installation. In the interim, some attempt at adjustment and compromise was discussed. The rejection was within a reasonable time and was effective under the statute.

It is the conclusion of this Court that the judgment of the court below erroneously applied the law to the facts in this record and that the judgment on O'Brien's cause of action is wrong and must be reversed. This conclusion makes further discussion of McMullen's Points I through IV inclusive unnecessary. *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976).

■ Appellant's Point V charges the trial court with error in finding against him on his counterclaim for damages because the weight of the evidence demonstrated that

he had suffered damages as a result of O'Brien's breaches of the sales contract. McMullen testified that he estimated his loss of time for which he billed his clients on an hourly basis as between $3,000.00 and $4,000.00. He offered no further evidence in support of this other than his own estimate or guess. It was his burden to prove his damage, and the trial court properly did not accept this evidence as proper or acceptable proof of damages in support of the counterclaim. The Court did not err in holding against McMullen on his counterclaim. *Midwestern Realty Corporation v. Grandview*, 416 S.W.2d 35, 39 [7] (Mo.App. 1967); *Aron v. Resz*, 343 S.W.2d 81, 82 [4] (Mo.App.1961). This Court will not disturb the judgment on this point.

Accordingly, the judgment below is reversed and remanded with directions to enter a new judgment for the defendant, David H. McMullen, on plaintiff's petition, and for the plaintiff, Glen O'Brien Movable Partition Company, Inc. on defendant's counterclaim, and to make such further orders in the judgment with reference to the past storage, moving costs and disposition of the goods which comprise the subject matter of this action in light of the present circumstances.

It is so ordered.

All concur.