**HGS HOMES, INC., Plaintiff/Appellant,**

v.

**KELLY RESIDENTIAL GROUP, INC., Defendant/Respondent.**

**No. 71276.**

Missouri Court of Appeals, Eastern District, Division Two.

July 8, 1997.

---

Alan G. Gerson, Evan D. Buxner, Blumenfeld, Kaplan & Sandweiss, P.C., St. Louis, for plaintiff/appellant.

S. Todd Hamby, Rothman, Sokol, Adler & Sarachan, P.C., St. Louis, for defendant/respondent.

CRANE, Presiding Judge.

Plaintiff homebuilder terminated its contract with defendant real estate developer for the sale and purchase of 43 residential lots. Plaintiff then sought to enforce a provision in the terminated contract which gave plaintiff an option to purchase one or more of the 43 lots for display homes. After filing a third amended petition and then voluntarily dismissing the action, plaintiff appeals from the trial court's order dismissing the breach of written contract count of its amended petition for failure to state a claim. We affirm.

*Factual Background*

We recite the facts as alleged and incorporated in Count II in the amended petition and the contract incorporated therein. On October 13, 1994 Kelly Residential Group, Inc. (Kelly), as seller, entered into a real estate contract with HGS Homes, Inc. (HGS), as buyer. Kelly was the purchaser of 106 acres of real property which it proposed to develop into approximately 177 lots for single family residential homes in a subdivision. The contract, as amended, provided that Kelly would sell and HGS would purchase 43 of those lots, identified as lots 91 through 92, lots 55 through 74, and lots 124 through 144, and collectively identified as "the Property." The purchase price of the Property was $2,257,500.00 based on the sum of $52,500.00 per lot for 43 lots.

The contract obligated Kelly to have the Property zoned for single family residences and to make certain improvements on the Property, including streets, sewers, underground utilities, and grading prior to closing. Closing was scheduled for 15 days following the date that Kelly gave HGS written notice that all improvements to the Property had been completed. The contract further provided: "If Closing does not take place, due to no fault of Purchaser, prior to May 15 1995, Purchaser may terminate this Contract and all earnest money will be returned."

Paragraph 15 of the contract gave HGS the option to purchase and close earlier on one or more display lots contained in the Property to be used as "display lots." It provided in part:

> [F]ollowing Seller's acquisition of the Property pursuant to the Acquisition Contract and prior to the Closing, Purchaser shall have the option to purchase one or more Lots contained in the Property and located in a convenient place thereon, as determined by the Seller and Purchaser in their reasonable discretion (collectively, the "Display Lots"). Purchaser shall exercise its option to purchase a Display Lot by Giving Seller written notice of the same (the "Option Notice"). Said Option Notice shall describe the Display Lot(s) to be purchased by Purchaser hereunder and the proposed closing date (a "Display Lot Closing Date"), which Display Lot Closing Date shall be not earlier than seven (7)

days from the date of seller's receipt of the Option Notice.

On each Display Lot Closing Date, Purchaser shall pay to Seller in immediately available funds an amount equal to Fifty–Two Thousand Five Hundred Dollars ($52,500.00) per Display Lot provided said Lot(s) are known as Lots 90 through 92 inclusive and Seller shall deliver to Purchaser those documents listed in Section 16 paragraphs (A), (B), and (C) hereof pertaining to the Display Lots then being acquired.

The contract required that written notices to the parties be personally delivered or mailed by registered or certified mail return receipt requested. Notices to Kelly were to be addressed to Kelly Residential Group, Attn: Mark A. Kelly with a copy to Todd Hamby.

The amended petition alleged that, after Kelly purchased the 177 lots, HGS, through its agent Harold Siegfried, gave notice to Kelly's agent, Mark Kelly, that HGS was exercising its right to purchase lots 91 and 92 to be used as display lots for $52,500.00 per lot and that Kelly thereafter agreed to convey title. On March 6, 1995, Kelly gave HGS permission to begin construction of the display homes. HGS began construction of the homes. On May 19, 1995 HGS terminated the contract pursuant to Paragraph 16 of the contract because closing had not taken place. HGS alleged that it has tendered "written contractual" performance of the purchase and sale of the display lots and demanded that Kelly convey title to lots 91 and 92, but Kelly refused to accept that tender or convey title to these lots.

*Procedural History*

On June 8, 1995 HGS filed a verified petition in three counts against Kelly seeking specific performance, injunctive relief and damages arising out of Kelly's refusal to accept tender or to convey the two display lots. It alleged in paragraph 12:

12. On May 19, 1995, HGS, in accordance with the Contract's express terms, terminated the Contract because closing had not taken place. See, Exhibit A at paragraph 16.

On Kelly's motion the trial court dismissed the three counts based on its finding that paragraph 15 of the contract did not entitle plaintiff to relief where plaintiff had not closed on the purchase of the display lots prior to terminating the contract. HGS then filed an amended petition in eight counts against Kelly seeking equitable relief and damages for Kelly's failure to convey the two display lots. In Count II, the subject of this appeal, HGS sought damages for breach of the written contract. It incorporated paragraph 12 from Count I which alleged:

12. On May 19, 1995, HGS, in accordance with the Written Contract's express terms, terminated the Written Contract with respect to the remaining lots, i.e., not the display lots, because Closing had not taken place. See, Exhibit A at paragraph 16.

Kelly moved to dismiss Count II and three other counts for failure to state a claim. The trial court dismissed those counts with leave to amend. HGS thereafter filed a third amended petition in five counts, again for equitable and legal relief. Seven months later, HGS voluntarily dismissed the action without prejudice pursuant to Rules 67.01 and 67.02(a). HGS appeals from that portion of the October 12, 1995 order dismissing Count II.

*Issue on Appeal*

On appeal HGS argues that the trial court erred in dismissing Count II because it stated a claim for breach of contract with respect to the display lots and its allegation that it terminated the contract with respect to the remaining lots does not defeat its claim for relief. HGS argues that it was possible for it to terminate its rights with respect to the "remaining lots" and reserve its rights with respect to the lots identified as "display lots." It further argues that its rights to the display lots were severable from the rest of the contract.

*Standard of Review*

On review of a trial court's order dismissing a petition for failure to state a claim upon which relief may be granted, we must determine if the facts pleaded and all the inferences reasonably drawn therefrom

state any grounds for relief. *Kanagawa v. State By and Through Freeman*, 685 S.W.2d 831, 834 (Mo. banc 1985). We give the pleadings their broadest intendment, we accept all properly pleaded facts as true, and we construe all allegations favorably to the pleader. *Baugher v. Gates Rubber Co., Inc.*, 863 S.W.2d 905, 907 (Mo.App.1993). However, we do not accept the conclusions of the pleader. *Id.* We consider any attached exhibits as part of the petition for all purposes. *Id.;* Mo.R.Civ.P. 55.12. Because the contract was attached to and incorporated into HGS's petition, we review it as well as the allegations contained in Count II of the amended petition in determining whether HGS has stated a claim for breach of that contract. *Michigan Sporting Goods Distributors, Inc. v. Lipton Kenrick Associates, L.P.*, 927 S.W.2d 570, 573 (Mo.App.1996).

*Discussion*

HGS's allegation that, in accordance with the contract's express terms, it had terminated the contract only with respect to the remaining lots is a legal conclusion and not a factual allegation which is considered admitted. Whether HGS could terminate the contract but reserve its power to exercise its option to close on the display lots is a legal question to be determined from the contract.

In this case the contract gave HGS an option to terminate the contract which HGS exercised. HGS pleaded that it terminated the contract under the express provisions of the contract and referred to paragraph 16. This clause does not provide for partial termination or exempt any contract provision from termination. Where a party terminates a contract according to its provisions, the contract and all rights thereunder are wholly abandoned. *Thumm v. Lohr*, 306 S.W.2d 604, 609 (Mo.App.1957). Both parties are then discharged from their contractual duty to perform promises that are still wholly executory. ARTHUR CORBIN, 6 CORBIN ON CONTRACTS Section 1266, p. 66 (1962). After termination of a contract all of the parties' unperformed undertakings are ended.

In the absence of an express provision providing for partial termination of a contract, a contract cannot be partially abrogated under a termination provision. 17A C.J.S. Contracts Section 403 (1963). Thus, a party who elects to terminate cannot thereafter assert the contract for some purposes and regard it as terminated for others. *Id.*

The paragraph giving HGS the option to purchase one or more of the 43 lots as display lots and close early on those lots is an "option." An option consists of a continuing and irrevocable offer which the optionor cannot withdraw during a stated period. *Lake Cable, Inc. v. Trittler*, 914 S.W.2d 431, 434 (Mo.App.1996). It vests the optionee with a power of acceptance and, when the optionee accepts the offer in the prescribed manner, the option is deemed to have been exercised so as to create a binding bilateral contract. *Id.* The bilateral contract so created is specifically enforceable. *Frey v. Yust*, 516 S.W.2d 321, 323 (Mo.App.1974); *Estate of Polete v. Campbell*, 764 S.W.2d 179, 180 (Mo.App.1989). However, until the optionee accepts, there is no enforceable contract. *Carroll's Warehouse v. Rainbow Paint*, 824 S.W.2d 147, 151 (Mo.App.1992) (quoting *Lusco v. Tavitian*, 296 S.W.2d 14, 16 (Mo.1956)).

A valid option to purchase land requires independent consideration separate and apart from the purchase price to be paid for the land. *Rockhill Tennis Club of Kansas City v. Volker*, 331 Mo. 947, 56 S.W.2d 9, 17 (1932). However, where the option is incorporated into a larger real estate contract or lease, the mutual considerations supporting the entire contract or lease support the option provision. *Johnson v. Farrow*, 594 S.W.2d 655, 657 (Mo.App.1980); *Rockhill*, 56 S.W.2d at 17; *see also* JOSEPH PERILLO AND HELEN BENDER, 2 CORBIN ON CONTRACTS Section 5.12, p. 59 (Rev. ed. 1996); ERIC HOLMES, 3 CORBIN ON CONTRACTS Section 11.10, p. 546 (Rev. ed. 1996).

Options to purchase are strictly construed against a person whose right it is to exercise the option. *Polete*, 764 S.W.2d at 180; *Boatmen's Bank v. Crossroads W. Shopping*, 907 S.W.2d 800, 803 (Mo.App. 1995). An optionee must exercise the option in strict accordance with its expressly stated

terms and conditions. *Frey,* 516 S.W.2d at 323–24; *Polete,* 764 S.W.2d at 180; *Boatmen's,* 907 S.W.2d at 803; *Carroll's Warehouse,* 824 S.W.2d at 151. *See also Gottlieb v. LaBrunerie,* 514 S.W.2d 27, 31–32 (Mo. App.1974).

■ At the time HGS exercised the termination option, HGS had not exercised its option to purchase a display lot in the manner required by paragraph 15. HGS did not allege that it personally delivered or mailed by registered or certified mail, return receipt requested, to Kelly, with a copy to Hamby, a written "Option Notice" describing the lots to be purchased and containing a "Display Lot Closing Date." The "Display Lot Closing Date" was to be not less than seven days after the notice and was the date on which HGS would pay and Kelly would deliver title. HGS did not allege that it ever gave notice of a Display Lot Closing Date in any manner.

Because the option was not exercised prior to HGS's termination of the contract, no bilateral contract was formed which would obligate Kelly to convey the display lots. The option to purchase display lots was terminated upon the termination of the contract because the termination of the contract terminated the entire contract and discharged Kelly from its executory promises.

■ HGS argues that the option to purchase display lots is severable from the rest of the contract and therefore was not terminated when the contract was terminated. We disagree. In the first place, even if HGS's theory were correct, it would not be entitled to relief because it has not pleaded that it exercised the option in accordance with paragraph 15 after it terminated the contract. In any event the option to purchase display lots is not severable.

■ In determining the intent of the parties we look at the language used and the subject matter of the agreement. *Rexite Casting Co. v. Midwest Mower Corp.,* 267 S.W.2d 327, 331 (Mo.App.1954). Five criteria which aid in this process are: 1) whether the subject matter of the contract is divisible; 2) whether the consideration is entire or apportioned; 3) whether the obligation is due at the same time to the same person; 4) whether the contract is to take the whole or none; and 5) whether the parties assented to all the promises as a single whole so that there would be no bargain whatever if any promise or set of promises were stricken out. *Id.* at 332 (citing *Swinney v. Continental Bldg. Co.,* 340 Mo. 611, 102 S.W.2d 111, 120[3] (1937)).

■ That a contract concerns two separate articles does not necessarily make the contract divisible, where the two articles are so interrelated that one is actually the counterpart of the other. *Rexite,* 267 S.W.2d at 332. *See also Norman v. Ballentine,* 627 S.W.2d 83, 86 (Mo.App.1981); *Glen O'Brien Movable Partition v. McMullen,* 608 S.W.2d 512, 518 (Mo.App.1980). Here the display lots and the remaining lots were so interrelated that the display lots were a counterpart of the remaining lots. The display lots were part of the 43 lots under contract. The parties would not have contracted for an option to purchase two display lots if HGS was not going to acquire all 43 of the lots. As discussed above, the consideration supporting the clause granting an option to close early on display lots is derived from the contract as a whole. Once that contract was terminated there was no consideration to support the option apart from the contract.

Because HGS's termination of the contract terminated its unexercised option to purchase display lots, Count II of the amended petition fails to state a claim for breach of contract relating to the display lots. The trial court did not err in dismissing that count.

The judgment of the trial court is affirmed.

GERALD M. SMITH and PUDLOWSKI, JJ., concur.