

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | |
|---|---|
| STATE OF MISSOURI, OFFICE OF ADMINISTRATION, et al., | ) ) ) |
| Appellants-Respondents, | ) ) |
| v. | ) ) ) ) |
| PHARMACY CORPORATION OF AMERICA, d/b/a PHARMERICA, et al., | ) ) ) |
| Respondents-Appellants. | ) |

**WD81811**
**(Consolidated with 81819)**

**OPINION FILED:**
**September 3, 2019**

**Appeal from the Circuit Court of Cole County, Missouri**
**The Honorable Daniel R. Green, Judge**

**Before Division Two:** Lisa White Hardwick, Presiding Judge, and
Thomas H. Newton and Mark D. Pfeiffer, Judges

The State of Missouri, Office of Administration ("State") appeals the partial summary judgment of the Circuit Court of Cole County, Missouri ("circuit court"), for Pharmacy Corporation of America ("PharMerica"), on the State's breach of contract claim. Conversely, PharMerica cross-appeals the circuit court's partial summary judgment in favor of the State. We affirm.

## Factual and Procedural Background

The material facts are not in dispute.

On May 21, 2009, the State issued a Request for Proposal ("RFP") seeking a pharmacy vendor to provide services and pharmaceuticals for the residents of the Missouri Veterans Homes. The RFP provided that the "original contract period" would extend from the Date of Award through June 30, 2010 ("Year 1"). The RFP also provided that the State could, in its sole discretion, renew the contract on a yearly basis for up to four more years thereafter ("Year 2," "Year 3," "Year 4," and "Year 5").

On June 2, 2009, PharMerica submitted a bid in response to the State's RFP. PharMerica is the second largest institutional pharmacy company in America with nearly $2 billion in annual revenues. PharMerica's bid provided per resident, per month pricing for the "original contract period" and "each potential renewal period" at the same rate, $425, for all five years. On August 13, 2009, the State awarded the contract to PharMerica, sending it a Notice of Award. The Notice provided that the original contract period was from September 1, 2009, to June 30, 2010.

Both PharMerica and the State fully performed for the original contract period. During that time, however, in a meeting on February 18, 2010, PharMerica communicated to the State that it was "losing money" and claimed it would not perform past Year 1. In a letter dated May 6, 2010, PharMerica indicated to the State that "If the state elects to renew the contract, PharMerica does not intend to enter into a renewal agreement" after the expiration of the original contract period on June 30, 2010. The State responded in a letter of May 11, 2010, stating PharMerica "does not have an option to decline the renewal" and that any refusal to honor the renewal provisions of the contract "will be viewed and acted upon by the State of Missouri as a material breach of PharMerica's contractual obligations" and further expressed in a letter of June 23, 2010, that "[a]ny actions by PharMerica after June 30, 2010, that are not consistent with

2

the terms of the contract will be considered a breach and the state will refer the matter [to] the Missouri Attorney General's Office for appropriate legal remedies." On June 7, 2010, the State issued a Notice of Contract Renewal for Year 2, for the period from July 1, 2010 through June 30, 2011. PharMerica issued an ultimatum in early July that it would not perform past July 31, 2010, at the contracted price, and would not provide a ninety-day transition period (as called for in the contract) for the State to get a replacement contractor.

The State then replaced PharMerica with the second-place bidder from the initial RFP—Interlock—at a cost higher than PharMerica's contract price. The last date PharMerica provided pharmacy services to Missouri Veterans Homes was July 31, 2010.

Interlock acted as the State's contractor for the remaining eleven months of Year 2 and for all of Years 3, 4, and 5. The State did not communicate again with PharMerica until serving a demand letter on January 21, 2015, claiming PharMerica was liable for breaching Years 2-5 of the contract and quantifying its alleged damages. On June 11, 2015, the State sued PharMerica for breach of contract. Following depositions and written discovery, the parties both filed motions for summary judgment. The circuit court granted the State's motion for summary judgment as to Year 2, and granted PharMerica's motion for summary judgment as to Years 3 through 5.

This appeal and cross-appeal timely follow.

**Standard of Review**

The Missouri Supreme Court explained the standard of review for the grant of summary judgment in *Goerlitz v. City of Maryville*:

> The trial court makes its decision to grant summary judgment based on the pleadings, record submitted, and the law; therefore this Court need not defer to the trial court's determination and reviews the grant of summary judgment *de novo*. *ITT Commercial Fin. Corp. v. Mid-America Marine Supply Corp.*, 854

3

S.W.2d 371, 376 (Mo. banc 1993); Rule 74.04. In reviewing the decision to grant summary judgment, this Court applies the same criteria as the trial court in determining whether summary judgment was proper. *Id.* Summary judgment is only proper if the moving party establishes that there is no genuine issue as to the material facts and that the movant is entitled to judgment as a matter of law. *Id.* The facts contained in affidavits or otherwise in support of a party's motion are accepted "as true unless contradicted by the non-moving party's response to the summary judgment motion." *Id.* Only genuine disputes as to material facts preclude summary judgment. *Id.* at 378. A material fact in the context of summary judgment is one from which the right to judgment flows. *Id.*

A defending party . . . may establish a right to summary judgment by demonstrating: (1) facts negating any one of the elements of the non-movant's claim; (2) "that the non-movant, after an adequate period for discovery, has not been able and will not be able to produce sufficient evidence to allow the trier of fact to find the existence of any one" of the elements of the non-movant's claim; or (3) "that there is no genuine dispute as to the existence of facts necessary to support movant's properly pleaded affirmative defense." *Id.* at 381. Each of these three methods individually "establishes the right to judgment as a matter of law." *Id.*

333 S.W.3d 450, 452-53 (Mo. banc 2011); *Ditto, Inc. v. Davids*, 457 S.W.3d 1, 8-9 (Mo. App. W.D. 2014).

## Analysis

On appeal, the State asserts that the grant of partial summary judgment was erroneous because the State exercised its option to extend the contract for a second year and PharMerica's conduct made it "not only useless but impossible" to continue to exercise its option to extend the contract each year thereafter. In its cross-appeal, PharMerica contends that the grant of partial summary judgment was erroneous because the State failed to meet its burden to establish that PharMerica's affirmative defenses failed as a matter of law. The parties' arguments will be analyzed in chronological order in the context of the contract.

**Year 1:**

There is no dispute that the parties both fully performed during the "original term" of the contract.

4

**Year 2:**

The circuit court granted the State's motion for summary judgment as to Year 2. PharMerica argues this was error because the State failed to meet its burden to establish that its affirmative defenses failed as a matter of law.

"Where the non-movant has properly pleaded an affirmative defense, a movant's right to summary judgment depends just as much on the non-viability of that affirmative defense as it does on the viability of the movant's claim." *Mobley v. Baker*, 72 S.W.3d 251, 257 (Mo. App. W.D. 2002) (citing *ITT Commercial Fin.*, 854 S.W.2d at 381). Where, as here, the claimant is moving for summary judgment and the non-movant has pleaded an affirmative defense:

> [the] claimant . . . must also establish that the affirmative defense fails as a matter of law. Unlike the burden of establishing *all* of the facts necessary to his claim, however, the claimant may defeat an affirmative defense by establishing that *any one* of the facts necessary to support the defense is absent. At this stage of the proceeding, the analysis centers on Rule 74.04(c); it is irrelevant what the non-movant has or has not said or done.

*Id.* (emphasis added) (quoting *ITT Commercial Fin.*, 854 S.W.2d at 381).

*Mistake*

The Missouri Supreme Court first dealt with "[t]he question of whether or not a contractor who has submitted a bid on a public contract may thereafter be allowed to rescind its bid on the basis of its unilateral mistake" in *State ex rel. Missouri State Highway Commission v. Hensel Phelps Construction Co.*, 634 S.W.2d 168, 171 (Mo. banc 1982). The court explained:

> Generally, the mistaken party may be relieved of its obligation if the mistake is not obvious, if the agreement is entirely executory, if the mistake is substantial, and if the mistake is the result of a *clerical* or *computational* error or a misconstruction of the specifications. *However, rescission is not allowed for a mistake of judgment or a lack of investigative effort*.

*Id.* (emphasis added). The *Phelps* court discussed the purpose of distinguishing between mistakes of judgment and clerical mistakes:

5

> There is a difference between mere mechanical or clerical errors made in tabulating or transposing figures and errors in judgment, as, for example, *underestimating the cost of labor and materials*. The distinction between the two types of errors is recognized in the cases allowing rescission and in the procedures provided by the state and federal governments for relieving contractors from mistakes in bids on public work. Generally, relief is refused for error in judgment and allowed only for clerical or mathematical mistakes. Where a person is denied relief because of an error in judgment, the agreement which is enforced is the one he intended to make, whereas if he is denied relief from a clerical error, he is forced to perform an agreement he had no intention of making.

*Id.* (quoting *M. F. Kemper Construction Co. v. City of Los Angeles*, 37 Cal.2d 696, 235 P.2d 7 (Cal. 1951) (emphasis added) (citations omitted)).

The Supreme Court reasoned that because the contractor was not diligent in determining labor precedent in the area of the worksite and made unjustified assumptions regarding sales tax in the face of clear and unambiguous language it had investigated prior to submitting its bid, its resultant mistake in its estimation of costs was solely a result of its failure to ascertain the true facts and without inducement or misrepresentation by the state entity and was not the type of mistake relieved at equity. *Id.* at 172-74. The Supreme Court therefore applied the longstanding precept that, "a party will not be allowed to rescind its obligation in equity when its mistake has resulted from a failure to ascertain the true state of facts and, without inducement by the other party, neglects to avail himself of his opportunities for information." *Id.* at 174.

Here, PharMerica had the RFP and additional extensive utilization data from which it had ample time to ascertain the true state of facts as they were relevant to determining pricing for its bid submission. A PharMerica employee attended a pre-bid meeting and asked questions, and from the answers given by representatives of the State, he misunderstood the clear requirements spelled out in the RFP, which he had read. The law, however, presumes that PharMerica had knowledge of the RFP when it submitted its proposal, and absent a showing of fraudulent inducement, which PharMerica did not assert below, PharMerica is further presumed to have

6

agreed to the requirements of the RFP's terms. *Dorsch v. Family Med., Inc.*, 159 S.W.3d 424, 436 (Mo. App. W.D. 2005).

Because it is factually undisputed that PharMerica did not ascertain the true state of facts as they were relevant to determining pricing for its bid, and because PharMerica has not alleged fraudulent inducement, the circuit court did not err in concluding that the unilateral mistake affirmative defense proffered by PharMerica failed as a matter of law.[1]

*Failure to Mitigate*

The State made reasonable efforts to mitigate its damages when PharMerica breached its contractual obligations to provide pharmaceutical products and services to the residents of Missouri Veterans Homes after July 31, 2010, and, likewise, refused to honor the contractually required ninety-day transition period. Thus, faced with the immediate dilemma caused by PharMerica's breach, the State returned to the results of the original RFP and entered into a replacement contract with Interlock, which had submitted the second best bid and was willing to honor it a year later. Interlock's proposal was higher than PharMerica's bid pricing but lower than what PharMerica was demanding in negotiations after it told the State it would not continue to perform at the agreed-upon pricing originally agreed to by PharMerica.

PharMerica argues the State was obligated to issue a new RFP in order to meet the requirement of making a reasonable effort to mitigate its damages. We disagree. The procedures for solicitation, receipt of bids, and award and administration of contracts by the State

---

[1] Additionally, "[a] party seeking rescission must act promptly on discovering the reason and need for his rescission" and "must act before the other party has changed his position or is placed in a position where he would be prejudiced by a rescission or where a third party would be harmed by a rescission." *Sheinbein v. First Boston Corp.*, 670 S.W.2d 872, 877 (Mo. App. E.D. 1984).

Here, a PharMerica representative told the State that it was not earning sufficient profits based on the financial parameters of its bid, in a meeting of February 18, 2010, after nearly six months of full performance of the contract. Even assuming that the discussions in this meeting constituted notification to the State that PharMerica had made a unilateral mistake in entering the contract, this notification came well after the State had changed its position and was placed in a position where it and the veteran residents would be prejudiced by a rescission.

7

are set forth in 1 CSR 40-1.050 [2019].  Generally, "[w]hen the procurement requires the utilization of competitive negotiation, the formal Request for Proposal (RFP) solicitation method should be utilized."  1 CSR 40-1.050(5).  However, "[r]egardless of the solicitation method utilized, . . . [t]he division may make multiple awards from a single solicitation document when such awards are in the best interest of the state."  1 CSR 40-1.050(10)(K).

Here, after PharMerica had communicated it would not continue to perform under the contract terms past Year 1, the State reminded PharMerica of its contractual obligation to accept four additional renewal periods at the option of the State (potentially a five-year total obligation) by various communications and by issuing a Notice of Contract Renewal for Year 2.  PharMerica ultimately confirmed via letter dated July 2, 2010, that it would not even assist the State in a ninety-day transition period following the end of Year 1 for the State to secure a different provider, as prescribed in the contract, but rather, would only provide service at the then-current rates through July 31, 2010, at the latest.  Thus, PharMerica's actions resulted in the State being placed in a position to find and transition to a replacement provider in less than twenty-nine days.  As the original RFP competitive bidding process took approximately three months, PharMerica knew that a twenty-nine-day bid process was highly improbable.  That the State, however, was able to secure a replacement provider for PharMerica, who agreed to charge *less* than PharMerica was then claiming to be "reasonable," demonstrated undisputed mitigation of damages by the State.

Promptly filling the void left in the wake of PharMerica's material breach with the second-place bidder from the recent RFP was both factually reasonable (particularly since the State replaced PharMerica with a provider that agreed to charge *less than PharMerica was demanding as a "reasonable" pricing structure*) and legally reasonable given the express

8

permission to do so provided in 1 CSR 40-1.050(10)(K). The circuit court did not err in finding the affirmative defense of failure to mitigate damages proffered by PharMerica failed as a matter of law.

***Estoppel, Waiver, Ratification, Unclean Hands, Laches, Acquiescence, Unconscionability, Illusory Contract, Lack of Consideration***

"Rule 84.04 sets forth various requirements for appellate briefs and compliance with these requirements is mandatory in order to ensure that appellate courts do not become advocates by speculating on facts and on arguments that have not been made." *Lattimer v. Clark*, 412 S.W.3d 420, 422 (Mo. App. W.D. 2013) (internal quotation marks omitted). Pursuant to these requirements, "[a]n argument must explain why, in the context of the case, the law supports the claim of reversible error. It should advise the appellate court how principles of law and the facts of the case interact." *Brown v. Brown-Thill*, 543 S.W.3d 620, 629 (Mo. App. W.D. 2018) (internal quotation marks omitted). Further, "[i]f a party fails to support a contention with argument beyond [mere] conclusions, the point is considered abandoned." *Id.* (internal quotation marks omitted).

Here, PharMerica summarizes the relevant factual scenario it suggests supports its affirmative defenses as the State waiting too long to notify them of their breach,[2] and the extent of its *argument* is a mere conclusion: "Under these circumstances, there is ample evidence in the record for PharMerica to prevail on its affirmative defenses of estoppel, waiver, ratification, unclean hands, laches, acquiescence, unconscionability, illusory contract, and lack of consideration at trial."

---

[2] This factual argument is relevant to Years 3 through 5 under the contract but simply is *not* relevant in Year 2—when it is undisputed that the State was demanding that PharMerica comply with the terms of the contract in its renewal notification to PharMerica and subsequent communications leading up to PharMerica's last date of service during Year 2 in which the State would deem PharMerica's refusal to continue providing services per the terms of the contract as a breach.

Because PharMerica's argument—as to Year 2 of the contract—regarding estoppel, waiver, ratification, unclean hands, laches, acquiescence, unconscionability, illusory contract, and lack of consideration fail to "demonstrate how principles of the law and the facts of the case interact" and are "not supported with argument beyond conclusions," these claims are considered abandoned. *Lattimer*, 412 S.W.3d at 423 (internal quotation marks omitted).

***The Contract's Limit of Liability Provision, Section 2.11.6***

In the RFP, Section 2.11.6 is entitled "Contractor Liability" and provides, in full:

The contractor shall be responsible for any and all personal injury (including death) or property damage as a result of the contractor's negligence involving any equipment or service provided under the terms and conditions, requirements and specifications of the contract. In addition, the contractor assumes the obligation to save the State of Missouri, including its agencies, employees, and assignees, from every expense, liability, or payment arising out of such negligent act.

a.  The contractor also agrees to hold the State of Missouri, including its agencies, employees, and assignees, harmless for any negligent act or omission committed by any subcontractor or other person employed by or under the supervision of the contractor under the terms of the contract.

b.  The contractor shall not be responsible for any injury or damage occurring as a result of any negligent act or omission committed by the State of Missouri, including its agencies, employees, and assignees.

c.  Under no circumstances shall the contractor be liable for any of the following: (1) third party claims against the state for losses or damages (other than those listed above); or (2) economic consequential damages (including lost profits or savings) or incidental damages, even if the contractor is informed of their possibility.

This provision is unambiguous and applies to claims of *negligence* brought by a *third party* against the State and/or the contractor related to the equipment or services provided pursuant to the contract. The provision in the RFP dealing with damages when a *contractor* breaches the contract is found in Section 16 dealing with cancellation of the contract in the event of material breach: "c. If the DPMM [Division of Purchasing and Materials Management]

10

cancels the contract for breach, the DPMM reserves the right to obtain the equipment, supplies, and/or services to be provided pursuant to the contract from other sources and upon such terms and in such manner as the DPMM deems appropriate and charge the contractor for any additional costs incurred thereby."

Because the RFP terms and resulting contract between the State and PharMerica does not absolve PharMerica from liability for consequential damages for its material breach of its contract with the State, the circuit court did not err in finding that affirmative defense proffered by PharMerica failed as a matter of law.

The circuit court did not err in partially granting the State's motion for summary judgment (and denying PharMerica's motion for summary judgment) as to Year 2.

**Years 3 through 5:**

The party holding an option must exercise that option "'in strict accordance with its expressly stated terms and conditions.'" *Carolan v. Nelson*, 226 S.W.3d 923, 927 (Mo. App. W.D. 2007) (quoting *HGS Homes, Inc. v. Kelly Residential Grp.*, 948 S.W.2d 251, 255-56 (Mo. App. E.D. 1997)). Such exercise must be "unequivocal and certain." *Id.* (internal quotation marks omitted). Only then, "[u]pon [the State]'s acceptance the option becomes a complete bilateral contract, supported by mutual promises, and is specifically enforceable." *Id.* (internal quotation marks omitted).

Here, the State does not dispute that the Notice of Contract Renewal for Year 2 did not purport to exercise the State's renewal options for the second, third, or fourth renewal periods nor that its representative testified that the State took no efforts to issue a Notice of Contract Renewal to PharMerica for Years 3, 4, and 5, as it had for Year 2. The State instead urges that it was excused from exercising its options for Years 3, 4, and 5 because PharMerica's conduct

11

made it "not only useless but impossible" to continue to exercise its option. The State cites to *Cooper v. Mayer*, 312 S.W.2d 127 (Mo. 1958), and *Norman v. McLelland*, 354 S.W.2d 906 (Mo. App. 1962), in support of its argument. The State's reliance on these cases is misplaced.

In *Cooper*, the parties entered into a written contract in which land was leased for a term of five years and the lessee was granted the option to purchase the land at any time before the expiration of the lease for $1,000. 312 S.W.2d at 127. Thereafter,

> plaintiff in good faith intended and was ready, able and willing to exercise the option in accord with the terms of the contract; . . . prior to the expiration of the lease, both defendants had due notice of his intention to exercise the option granted him and of his demand that proper deed of conveyance be executed upon payment of $1,000; . . . both defendants, with such knowledge, unconditionally repudiated and refused to comply with their agreement to sell the land to plaintiff upon payment of the sum of $1,000 before the expiration of the lease and thereafter undertook to prevent plaintiff from making an effective tender of the purchase price.

*Id.* at 130. Based on this sequence of events, where the landowner left her home to avoid contact with the option holder prior to the expiration of the option and her husband physically refused to take the $1,000 cash handed to him for the known purpose of exercising that option, the *Cooper* court applied the rule that "where failure of a party to perform a condition is induced by a manifestation to him by the other party that he will not substantially perform his own promise, performance of such condition is waived and, therefore, excused." *Id.* (internal quotation marks omitted). The *Cooper* court therefore concluded that the plaintiff was excused from "technical tender of the purchase price as a condition precedent to plaintiff's right to specific performance" and affirmed the trial court's judgment finding "that plaintiff had duly exercised his option to purchase the land in accord with the terms of the agreement and that defendants had refused to convey." *Id.* at 130-31, 127.

12

*Norman* involved an agreement which gave an option to purchase land within six months of the execution of the agreement for $15 per acre. 354 S.W.2d at 908. The agreement was made "with the understanding that the plaintiffs were to attempt to find buyers, and that this was the end result within the contemplation of the parties." *Id.* at 910. The plaintiffs found "buyers ready, willing, and able to pay in cash the full purchase price," but the "[defendant] voluntarily put it out of his power to convey title and . . . he flatly refused to proceed further with the deal." *Id.*[3] The court reasoned that, because the agreement was in the nature of a broker's contract, "[a]ctual tender of the purchase price or other action necessary to 'wrap up' the transaction on the part of plaintiffs or their assignees was not necessary where, because of defendant's refusal, it became plain and obvious that such action would become a useless gesture." *Id.* The court held:

> where the evidence shows that the option holder had in good faith a purchaser or purchasers ready, willing, and able to pay an agreed sum, and the transaction failed because of the refusal of the owner to comply therewith, and not through any unwillingness or inability of the option-holding purchasers or the would-be purchasers from the option holders to proceed, the loss to the option holders by breach of the contract, the loss of the bargain, has been established.

*Id.*

Most importantly, in contrast to the option holders in *Cooper* and *Norman*, here the State made *no attempt* whatsoever to exercise its option to renew for Year 3, Year 4, or Year 5, or to notify PharMerica that it intended to do so. In *Cooper* and *Norman*, the appellate courts affirmed the trial courts' excusing the option holders from actual tender of the purchase price based upon the evidence of their being ready, willing, and able to complete their obligation to do so to

---

[3] The option holders "told [seller] the purchasers were ready to do business, and asked him if he had made his arrangements to get the land (the 200 acres) back. At that time he said that 'he didn't aim to' and 'flatly refused' to go ahead with the option." *Norman v. McLelland*, 354 S.W.2d 906, 909 (Mo. App. 1962). Additionally, the seller refused delivery of option holders' "registered special delivery letter, stating that arrangements had been made . . . to pay for the land in compliance with the option after title was examined." *Id.* There was also evidence on the record that "[seller] went out of town to one place but told people he was going to another place" during the relevant time period during which option holders were attempting to exercise their option. *Id.*

exercise the option, and their *good faith efforts to do so* that were purposefully *thwarted* by purposeful actions of the optionees. Here, the State did not notify or attempt to notify PharMerica for each of Year 3, Year 4, and Year 5 that it intended to exercise its option to renew; the State did not send or attempt to send to PharMerica a Notice of Contract Renewal for each of Year 3, Year 4, and Year 5; and PharMerica did not purposefully avoid receipt of any such notice of intent to exercise or Notice of Contract Renewal. Although PharMerica informed the State multiple times that it did not intend to enter into a renewal agreement after the expiration of the original contract period unless the parties could agree to new pricing terms, PharMerica's continued availability to and communication with the State regarding the contract stands in stark contrast with the extreme evasive conduct of the vendors in *Cooper* and *Norman*.

Furthermore, the substance and function of the agreement in dispute is distinguishable from those in *Cooper* and *Norman* in that it was not a single-transaction option on a short-term, purchaser-vendor contract for land, but rather a contract for the provision of pharmaceutical services and products by a large corporation to the State for an initial term of one year, which gave the State an option to renew each year for up to four additional years. Further, PharMerica was not an individual landowner refusing or preventing tender of the purchase price by another individual option holder but, rather, a large corporation interacting with a government entity in accordance with the terms of their ongoing business agreement—which, giving the State the option to renew each year, by its nature was a "lawful wager made between sophisticated parties as part of an arms-length transaction." *Weinstein v. KLT Telecom, Inc.*, 225 S.W.3d 413, 415 (Mo. banc 2007).

Because it is factually undisputed that the State did not attempt to exercise its renewal options for the second, third, or fourth renewal periods, much less do so in a way that could be

14

argued to be "unequivocal and certain[,]" the options for Year 3, Year 4, and Year 5 did not become complete, specifically enforceable, bilateral contracts. *Carolan*, 226 S.W.3d at 927 (internal quotation marks omitted). Therefore, the circuit court did not err in partially granting PharMerica's motion for summary judgment (and denying the State's motion for summary judgment) on the grounds that there was no enforceable contract for Year 3, Year 4, and Year 5.

### Conclusion

The judgment of the circuit court is affirmed.

/s/ *Mark D. Pfeiffer*
Mark D. Pfeiffer, Judge

Lisa White Hardwick, Presiding Judge, and Thomas H. Newton, Judge, concur.