

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| **SHIRLEY S. BROWN,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD82873** |
| | ) | |
| **v.** | ) | **OPINION FILED: May 12, 2020** |
| | ) | |
| **STEPHEN L. SMITH,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Saline County, Missouri**
The Honorable W. Page Bellamy, Judge

Before Division Two: Mark D. Pfeiffer, Presiding Judge, Alok Ahuja, Judge and
Gary D. Witt, Judge

Stephen Smith ("Smith") appeals the judgment of the Circuit Court of Saline County denying his counterclaim for specific performance of an option agreement to purchase his sister's one-half interest in property they held jointly. Smith raises two points of error challenging the court's finding that the agreement was unenforceable. We reverse and remand.

**Factual and Procedural Background**

Smith and Shirley Brown ("Brown") are siblings and the children of Mary Jane Smith ("Mary Jane").[1] The family owned five tracts of land in Saline County, Missouri, totaling nearly 1,000 acres of real property. As part of Mary Jane's estate planning, on August 12, 2004, Smith, Brown, and Mary Jane met with Mary Jane's attorney ("Attorney"), to execute multiple documents that included deeds and conveyances, a cover "Memo," and a "Memorandum of Agreement" that was, in effect, an option agreement. The cover memorandum ("Memorandum") stated:

> The undersigned, being the heirs and devisees under the Last Will and Testaments of Twyman Smith, Gertrude Smith and Morris Smith,[2] for the purpose of clarifying titles and ambiguities thereto and for the mutual benefit of each of the undersigned as to present and future planning, have executed the conveyances among themselves attached hereto as exchanges of real estate interests for estate planning purposes, not as sales or gifts.

The Memorandum was signed by Smith, Brown, and Mary Jane. According to Attorney, the parties were "swapping interest and ending up so Mary Jane had some income for life" and Smith and Brown "each had some separate ground when she died. All of this was part of what they were doing that day." The five tracts were transferred as follows:

> **Tract One**: Approximately 248 acres. Smith and Brown, as the record owners, transferred their equal interests to Mary Jane via quit claim deed. Mary Jane executed a general warranty deed transferring Tract One to Brown and her heirs, subject to a life estate for Mary Jane.
>
> **Tract Two**: Twenty acres. Smith and Brown executed a general warranty deed transferring their interests to Mary Jane for life, with the remainder to Brown and her heirs.

---

[1] Because Mary Jane shares the same surname as her son, we refer to her by her first name for purposes of clarity. No familiarity or disrespect is intended.

[2] Twyman Smith and Gertrude Smith were Smith and Brown's paternal grandparents. Morris Smith was Smith and Brown's father.

**Tract Three**: 160 acres. Mary Jane transferred her interest to Smith reserving a life estate for herself via general warranty deed.

**Tract Four**: 165 acres. Brown transferred her remainder interest (which was to follow Mary Jane's life estate) to Smith.

**Tract Five**: 160 acres. Mary Jane transferred via general warranty deed her interest to Smith and Brown as tenants in common, each with an equal one-half interest, subject to a life estate for Mary Jane. Tract Five is legally described as: The Southwest Quarter of Section Twenty-eight (28) in Township Fifty-two (52) North, Range Twenty (20) West of the 5th Principal Meridian, Saline County, Missouri. ("Tract Five").[3]

**House**: Mary Jane executed a beneficiary deed naming Brown as the beneficiary upon Mary Jane's death.

In addition to the Memorandum and conveyances, Smith and Brown executed a

Memorandum of Agreement ("Option Agreement") regarding Tract Five that stated:

> The undersigned, Stephen L. Smith and Shirley S. Brown, being co-owners of the remainder interest in the Southwest Quarter of Section 28, Township 50, Range 20, following the life estate of Mary Jane Smith, for and in consideration of the mutual covenants herein, agree that, upon the death of the said Mary Jane Smith, the undersigned Stephen L. Smith shall have the option to purchase the one-half interest in fee then owned by Shirley S. Brown for the sum of $84,000.00. Such option shall be exercised by furnishing written notice thereof within thirty days following the death of the said Mary Jane Smith and tender of purchase price within thirty days after such notice. Upon failure to exercise such option by the said Stephen L. Smith, Shirley S. Brown shall have the same option on the same terms and time frame thereafter. Failure by either party to exercise such option shall nullify this Agreement and release the property thereafter.

---

[3] We note that the legal description of Tract Five in the Option Agreement set forth below does not accurately reflect the legal description of Tract Five. That description both fails to fully describe Tract Five so that it can be properly identified and inaccurately places the property in "Township 50" rather than "Township Fifty-Two (52)." However, the parties stipulated at trial that the reference to Township 50 rather than 52 was a scrivener's error and further stipulated to the correct boundaries of Tract Five and that Tract Five, as properly and legally described in the paragraph preceding this footnote, was the tract at issue. The Option Agreement was drafted by one party on behalf of Mary Jane, Smith, and Brown. "Where the scrivener acts for both parties and makes the mistake, then proof of his mistake establishes the mutual mistake, for he was the agent of both parties." *Hoffman v. Kaplan*, 875 S.W.2d 948, 953 (Mo. App. E.D. 1994). Based on the stipulation of the parties at trial we treat the Option Agreement, and documents discussing the Option Agreement, as referring to Tract Five.

3

> Nothing herein shall preclude or prevent the parties from earlier purchase or sale on different terms between themselves or otherwise nullifying this Agreement by mutual agreement.

Mary Jane was not a signatory to the Option Agreement. The Option Agreement dealt solely with Tract Five and provided the siblings an opportunity to buy each other's interest upon the death of Mary Jane.

Mary Jane died on April 13, 2018. Pursuant to the deed, her life estate in Tract Five was terminated automatically, which vested Smith and Brown each with an undivided one-half interest in the property as tenants in common. On April 24, 2018, Brown sent a letter to Smith stating that she was "revoking [Smith's] option to purchase the property in Saline County in the Southwest Quarter of Section 28, Township 50, Range 20, for which I have not received any consideration." In response, Smith sent a letter to Brown on May 2, 2018, notifying her that he was electing to "exercise said option to purchase" Tract Five under the terms and conditions established in the Option Agreement and subsequently timely tendered the purchase price to Brown's attorney.

Brown filed a petition to partition Tract Five on May 30, 2018 ("Petition"). Smith answered and filed a counterclaim for specific performance of the Option Agreement on June 21, 2018 ("Counterclaim"). The parties agreed that the circuit court should take up the issue of the Counterclaim prior to hearing the Petition's claim for partition, noting that if Smith was successful on the Counterclaim, it would make the partition claim moot. The circuit court held a one-day bench trial on March 14, 2019 ("Trial"). Specifically, the parties stipulated that Smith performed all obligations required to exercise his option, and

4

the sole question before the court was whether the Option Agreement "included consideration, or conversely, whether consideration was absent." Brown argued that legally if the Option Agreement lacked consideration, it could be unilaterally terminated by her at any time before Smith exercised his rights thereunder and her April 24, 2018 letter was an effective termination of the option agreement. In support of this argument Brown relies on *HGS Homes, Inc. v Kelly Residential Group, Inc.*, 948 S.W.2d 251 (Mo. App. E.D. 1997). Brown argues that when an option contract lacks independent consideration it constitutes a revocable offer which can be withdrawn or revoked at any time prior to its acceptance.

Brown, Smith, and Attorney testified at Trial. Brown admitted in her Answer to Smith's Counterclaim that the purchase price established by the Option Agreement for her undivided one-half interest in Tract Five was approximately equal to the per-acre purchase price of a tract of land that she and her husband had earlier purchased from her parents. Attorney testified that "Mary Jane wanted for [Smith] to have an option to buy [Brown's interest] so [Smith] would own it. But if he didn't exercise his option, then [Brown] would have the same option, based not on inflation farmland value, but on an old figure that they had within the family on other ground[.]"

The circuit court entered its Judgment on May 7, 2019 ("Judgment"). The court found that there was no mutuality of promise under the Option Agreement; it therefore lacked consideration. Further, the court found because neither the Memorandum nor the other conveyances referenced the Option Agreement, or *vice versa*, those conveyances could not serve as other consideration for the Option Agreement. Thus, the court held that

5

in the absence of consideration, Brown could revoke the Option Agreement at any time prior to Smith giving notice of his intent to exercise his rights under the agreement. The court entered judgment against Smith on the Counterclaim and certified the Judgment for appeal pursuant to Rule 74.01(b).[4] This appeal followed.

## Standard of Review

> The standard of review for a court-tried case is governed by *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). *G.H.H. Invs., L.L.C. v. Chesterfield Mgmt. Assocs., L.P.,* 262 S.W.3d 687, 691 (Mo. App. E.D. 2008). Thus, the judgment of the trial court will be affirmed unless insufficient evidence supports it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* The appellate court defers to the factual findings of the trial court, which is in a superior position to assess credibility. *Id.* It will, however, independently evaluate the trial court's conclusions of law. *Id.* Contract interpretation and questions of contract ambiguity are issues of law that will be reviewed *de novo. Id.*

*Fedynich v. Massood*, 342 S.W.3d 887, 890 (Mo. App. W.D. 2011). "Specific performance is purely an equitable remedy and must be governed by equitable principles." *Smith v. Najafi*, 584 S.W.3d 389, 394 (Mo. App. W.D. 2019) (quoting *ROH Farms, LLC v. Cook*,

---

[4] All rule references are to Missouri Supreme Court Rules (2016). We further note that, although not challenged, the circuit court's certification of the appeal pursuant to Rule 74.01(b) was proper under the latest guidance given by the Missouri Supreme Court in *Wilson v. City of St. Louis*, 2020 WL 203137 (Mo. banc Jan. 14, 2020). *Wilson* clarified that a ruling appealed from must be a "judgment" (i.e. it must fully resolve at least one claim in a lawsuit and establish all the rights and liabilities of the parties with respect to that claim) and that "judgment must be "final" to be eligible for certification under Rule 74.01(b). A "judgment must be 'final' in some sense, even if it is not final in the sense of resolving all claims (or the last claim) in a lawsuit." *Id.* at *4. "[A] judgment resolving one or more claims but leaving one or more claims unresolved is eligible for certification under Rule 74.01(b) as a 'final judgment' for purposes of section 512.020(5) only if it disposes of a 'judicial unit' of claims." *Id.* A judicial unit includes "a judgment that resolves one or more claims that are distinct from those claims that remain to be resolved." *Id.* at 5. "[C]laims are considered separate if they require proof of different facts and the application of distinguishable law, subject to the limitation that severing the claims does not run afoul of the doctrine forbidding the splitting of a cause of action." *Id.* (quoting *Comm. for Educ. Equal.* v. *State*, 878 S.W.2d 446, 451 (Mo. banc 1994)). In this case, although the parties and the property are the same for both the partition claim and the Counterclaim for specific performance, they are distinct judicial units because they require proof of different facts and application of distinguishable law; further, the trial court's ruling on the Counterclaim for specific performance fully resolved the claim in the lawsuit and established all the rights and liabilities of the parties with respect to that claim. As such, the Judgment deciding solely Smith's Counterclaim was properly certified under Rule 74.01(b).

6

572 S.W.3d 121, 125 (Mo. App. W.D. 2019). "The equitable remedy of specific performance is not a matter of right but is a remedy applied by courts of equity, depending upon the facts in the particular case; and the trial court has judicial discretion within the established doctrines and principles of equity to award or withhold the remedy." *Id.*

**Discussion**

Brown raises two allegations of error on appeal. Brown first contends that the circuit court erred in failing to find consideration was established by the mutual promises between Smith and Brown to offer to one another the option to purchase the other's one-half interest in Tract Five. Second, Brown contends that even if the Option Agreement lacked a mutual promise, consideration was given through the conveyances of the other tracts of land transferred.

An option contract may either be bilateral or unilateral. 3 CORBIN ON CONTRACTS § 11.2 (1996). If an optionee pays to the optionor consideration for the right of future purchase then a unilateral option agreement has been formed. *Id.* The optionee has an irrevocable option to purchase for the stated term of the agreement. *Id.* If, however, the optionee does not pay for the option agreement but instead merely promises to pay or offers some other promise in exchange for the option then the option is a bilateral agreement. *Id.* The optionee still has an irrevocable option to buy for the stated term of the agreement but the parties have exchanged mutual promises as consideration. *Id.* "Generally speaking, . . . if a contract contains mutual promises, such that a legal duty or liability is imposed on each party as a promisor to the other party as a promisee, the contract is a bilateral contract

7

supported by sufficient consideration." *Frye v. Speedway Chevrolet Cadillac*, 321 S.W.3d 429, 438 (Mo. App. W.D. 2010).

Smith argues that the Option Agreement is an irrevocable bilateral option agreement in which both Smith and Brown offered mutual promises to offer one another an option to purchase the other's undivided one-half interest in Tract Five for $84,000. Brown alleged, and the circuit court found, that Smith's promise was illusory and thus could not constitute consideration given to Brown in exchange for his option to purchase.

The Option Agreement states that Smith "shall have the option to purchase the one-half interest in fee then owed by [Brown] for the sum of $84,000" but "[u]pon failure to exercise such option by the said [Smith], [Brown] shall have the same option on the same terms and time frame thereafter." However, the Option Agreement then goes on to state: "[f]ailure by *either* party to exercise such option shall nullify this Agreement and release the property thereafter." (emphasis added). Brown argued, and the circuit court found that the phrase "failure by either party to exercise such option" means that if Smith chose not to exercise his option, he need not offer his interest in Tract Five to Brown because the agreement is nullified. Thus, there was no mutual promise between the parties to serve as consideration. Smith argued both before the circuit court and now on appeal that the contract was not illusory because he was required to offer his interest to Brown regardless of the nullification language. But, even if the Option Agreement lacked mutual promises,

8

consideration was given in the greater real estate exchanges that occurred on August 12, 2004.[5]

In his first point relied on, Smith argues that the circuit court erred in finding that Smith's promise was illusory and thus could not constitute consideration given to Brown in exchange for his option to purchase. The cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent. *Royal Banks of Mo. v. Fridkin,* 819 S.W.2d 359, 362 (Mo. banc 1991). "The intent of the parties . . . is determined based on the contract alone unless the contract is ambiguous." *Whirlwind Props., LLC v. John John & Boone Grp., LTD.*, 536 S.W.3d 312, 316 (Mo. App. W.D. 2017) (quoting *Ethridge v. TierOne Bank*, 226 S.W.3d 127, 131 (Mo. banc 2007)). "[A] contract is only ambiguous, and in need of a court's interpretation, if its terms are susceptible to honest and fair differences." *Ethridge*, 226 S.W.3d at 131. If the contract is not ambiguous, this Court is limited to reviewing the four corners of the contract. *Lobo Painting, Inc. v. Lamb Const. Co.*, 231 S.W.3d 256, 258 (Mo. App. E.D. 2007) (citing *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 859-60 (Mo. banc 2006)). When considering whether a particular term or phrase is ambiguous the test "is whether the disputed language, *in the context of the entire agreement*, is reasonably susceptible of more than one construction giving the words their plain meaning as understood by a reasonably average person." *Greenberg v. Saha*, 84 S.W.3d 474, 476 (Mo. App. E.D. 2002) (emphasis added).

---

[5] Although the parties and Mary Jane executed various conveyances, specifically Smith transferred his interest in Tracts One and Two to Mary Jane who then executed a general warranty deed transferring Tracts One and Two to Brown and her heirs, subject to a life estate for Mary Jane.

9

Brown asserts that "either party" should be read to mean if Smith *or* Brown chooses not to exercise their option the agreement becomes a nullity. This would result in the Option Agreement becoming an immediate nullity upon Smith choosing to not exercise his option, effectively making the mutuality of promise illusory. Smith would not have to offer his interest in Tract 5 to Brown because the Option Agreement would be void and the language discussing Smith's offer of his interest in Tract 5 would be meaningless. "Courts do not favor the destruction of agreements" thus we must "construe each term of a contract to avoid an effect which renders other terms meaningless or illusory." *Parker v. Pulitzer Pub. Co.*, 882 S.W.2d 245, 250 (Mo. App. E.D. 1994); *Bolton v. Bolton*, 950 S.W.2d 268, 271 (Mo. App. E.D. 1997) ("Each term is construed to avoid an affect which renders other terms meaningless: a construction which attributes a reasonable meaning to all of the provisions of the agreement is preferred to one which leaves some of them without function or sense.").

Webster's dictionary defines "either" as: "1: the one and the other of the two: EACH . . . 2: the one or the other of the two." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 728 (1993). The primary definition is one that recognizes a reference to "one *and* the other" or "each" party while the secondary definition is one, but not both, parties. Certainly where the definition of the word itself gives two different interpretations, the differing interpretations asserted by the opposing parties, it is appropriate to find that the meaning is ambiguous.

Brown's interpretation focuses solely on the term "either" and does not consider the meaning of the word within the totality of the agreement. When read within the context of

10

the sentence and the larger agreement, a more reasonable interpretation is that within the sentence: "Failure by either party to exercise such option shall nullify this Agreement and release the property thereafter," "either party" means "each party." If both Brown and Smith each decline to exercise their option, the Option Agreement is nullified.[6] Stated another way, if neither party exercises their option, the Option Agreement is nullified. Although inartfully drafted, we find that it is a reasonable interpretation of the Option Agreement and the only interpretation that does not lead to the contract being illusory and terms being rendered meaningless.

This interpretation is supported by the testimony of both Smith and Brown. The parties both testified that they believed they had exchanged mutual promises when they signed the Option Agreement. Regarding her understanding of the Option Agreement, Brown testified:

> Q. Okay. And you're aware that in the agreement Stephen had 30 days after your mother's death to notify you of his -- by written notice, notify you of his intention to purchase the property from you, your half-interest?
>
> A. Correct.
>
> Q. And then if he did not do so, you had -- for the same purchase price, you had the right to buy Stephen's half-interest, giving him notice?
>
> A. Yes.
>
> Q. Okay.
>
> A. Correct.

---

[6] By making the agreement a nullity if neither party exercises the rights thereunder the language seeks to avoid a potential future cloud on the title to the land.

Q. Is there anything you didn't understand about this agreement?

A. No.

Q. Okay. It was clear to you?

A. Yes.

Smith similarly testified that:

Q. All right. And so, when your mother worked on an estate plan with Mr. Huff, she gave you an -- you and Shirly agreed on an option that you could buy Shirly's interest in Tract 5?

A. Yes, sir.

Q. And you understood, and you agreed she made a promise that she'd sell it to you, didn't she?

A. Yes, sir.

Q. And you promised if you did not buy if from her in a timely fashion, you made a promise you would sell your interest, your half-interest, to her?

A. Yes, sir.

Q. For the same price?

A. Yes, sir.

There is no question that the intent of the parties was to exchange mutual promises to offer their one-half interest in Tract 5 to the other for a specified price. Only if neither party exercised its option would the Option Agreement become a nullity.

In the alternative, even if the parties' mutual promises did not establish consideration, we find that consideration may also be found in the contemporaneously executed real estate conveyances. In his second point relied on, Smith contends that the circuit court erred in finding that those conveyances could not serve as additional

12

consideration. The circuit court found that the other conveyances could not form the basis for consideration because the documents failed to reference or incorporate the others. The Option Agreement stated only a general recital of "for and in consideration of the mutual covenants herein . . ." and made no reference to the other documents executed on August 12, 2004. The court noted that the Memorandum only stated: "for the mutual benefit of each of the undersigned as to present and future planning, have executed the conveyances among themselves attached hereto as exchanges of real estate interests for estate planning purposes, not as sale or gifts." The court focused on the language "for the mutual benefit of each of the undersigned"; and upon finding that Mary Jane was a signatory to the Memorandum but not the Option Agreement, the court concluded that parties did not intend to reference the Option Agreement in the Memorandum. Instead, the court found the Memorandum was solely referring to the conveyances between all the parties and did not serve to establish consideration. We disagree.

The Memorandum clearly establishes that the intent of the parties was for "present and future planning" and the parties are all in agreement that the documents were executed as Mary Jane's estate plan. "A valid option to purchase land requires independent consideration separate and apart from the purchase price to be paid for the land." *HGS Homes, Inc. v. Kelly Residential Grp., Inc.*, 948 S.W.2d 251, 255 (Mo. App. E.D. 1997). "However, where the option is incorporated into a larger real estate contract or lease, the mutual considerations supporting the entire contract or lease support the option provision." *Id.* Although in this case, there were multiple conveyances executed as separate documents, they were all part of a single larger estate plan and real estate transaction.

13

Prior to these transfers Mary Jane owned Tract 5. As part of her estate plan she transferred this tract to Brown and Smith, but as a condition of her transferring Tract 5 to them, she required them to execute the Option Agreement. It was all part of one set of transactions. Neither Brown nor Smith would have had any interest in Tract 5 at all if they had not agreed to the option. Mary Jane as the owner of the property could transfer the property to them and place restrictions on that transfer. Mary Jane provided the Option Agreement as part of her estate plan. If either Brown or Smith did not want to give an option to the other, Mary Jane could have done something different with Tract 5 or the other property in her estate plan. Because Brown and Smith accepted the property from Mary Jane, they are bound by the option, which she required them to include in the transfer.

We find *Johnson ex rel. Johnson v. JF Enterprises, LLC*, 400 S.W.3d 763 (Mo. banc 2013) instructive. In *Johnson*, the plaintiff executed multiple documents in the course of purchasing a car from the defendant, including a sale contract with a merger clause and a separate arbitration agreement. *Id.* at 765. When the plaintiff brought suit against the dealership, she sought to avoid arbitration by arguing that the merger clause of the sales contract negated the arbitration agreement and rendered it void. *Id.* The Court noted that, under Missouri law, where "several instruments relating to the same subject are executed at the same time[,]" "the documents will be construed together, even in the absence of explicit incorporation, unless 'the realities of the situation' indicate that the parties did not so intend." *Id.* at 767 (quoting *Martin v. U.S. Fid. Corp.*, 996 S.W.2d 506, 510-11 (Mo. banc 1999)). "Whether or not the documents are treated as a single contract depends on

14

the intent of the parties, but even where not part of a single contract, courts will consider the instruments together to determine the parties' intent." *Id.* at 767-68.

There is no doubt that the parties intended all the documents signed on August 12, 2004, to be valid and serve as the estate plan of Mary Jane. Mary Jane's Attorney was asked specifically about the intent behind the Option Agreement:

> Q. And I'm not asking you to conjecture. I guess what I would say then is did that option to purchase have anything to do with any of the other cleaning up of the real estate?
>
> A. Yes. Yeah, this was -- because this one piece, this piece of ground -- I think there's a typo in that number, but I think that piece of ground she owned and she was -- she -- she could have done anything she wanted to with it. But I think she was willing to deed it to both kids, unlike the rest of it, where they got separate tracts. But she wanted for [Smith] to have an option to buy the other half so he would own it. But if he didn't exercise his option, then [Brown] would have the same option, based not on inflation farmland value, but on an old figure that they had within the family on other ground, was my recollection. But she didn't -- I think I heard that in that meeting, but it was not a part of her thinking for me. She just said, "Here's -- I will -- I will deed this to both kids when I go, when I die, but I want -- I want it to end up in one of them, the option to buy here." That was her aim.

Attorney prepared the documents in an effort to effectuate Mary Jane's intent. Brown was asked if she disagreed with any of Attorney's testimony regarding the estate plan and she stated that she did not, although she maintained the entirety of the conveyances that occurred on August 12, 2004, were to simply "clean up [ownership of] granddad's" tracts of land. As noted above, on cross-examination Brown further discussed the Option Agreement:

> Q. Okay. And you're aware that in the agreement Stephen had 30 days after your mother's death to notify you of his -- by written notice, notify you of his intention to purchase the property from you, your half-interest?

A. Correct.

Q. And then if he did not do so, you had -- for the same purchase price, you had the right to buy Stephen's half-interest, giving him notice?

A. Yes.

Q. Okay.

A. Correct.

Q. Is there anything you didn't understand about this agreement?

A. No.

Q. Okay. It was clear to you?

A. Yes.

While Brown did testify that the conveyances were for the purpose of cleaning-up ownership of her grandfather's land, her other testimony, along with the testimony of Attorney and Smith clearly establish that the greater intent was to divide the land as an estate plan for Mary Jane; the Option Agreement was a part of that. The price to exercise the option was specifically set in reference to an earlier real estate transaction that Brown had completed with her parents. Both parties testified that Smith had been upset that his parents had offered to sell Brown some of their property at a below-market rate and he had not been given the same opportunity.

The circuit court erred when it determined that the documents could not be interpreted together simply because they did not incorporate each other by reference. Although the conveyances, Memorandum, and Option Agreement were not part of a single document, they were all part and parcel to a single estate plan and real estate transaction.

16

We interpret together all documents relating to a single subject executed at the same time, "unless the realities of the situation indicate that the parties did not so intend." When we examine the realities of the situation it is clear and unquestionable that the parties intended all of the documents to be part of one estate plan. The documents were prepared together and executed together. As such, the conveyances between the parties can and do serve as consideration for the Option Agreement.

Because the Option Agreement is supported by consideration, both by mutual promise and the transfer of other real estate, it was irrevocable and the court erred in finding that Brown properly revoked the agreement prior to Smith's exercise of his option.

### Conclusion

The circuit court erred in finding that the Option Agreement was unilaterally revocable because it was not supported by consideration. We reverse the Judgment and remand this case for further proceedings consistent with this opinion.[7]

_____
Gary D. Witt, Judge

All concur

---

[7] Any final judgment entered following the further proceedings in this cause, and any conveyance documents, if necessary, should reflect the proper legal description of Tract 5 and not the incorrect legal description included in the Option Agreement.

17